John O. THREADGILL

v.

**BOARD OF PROFESSIONAL RE-SPONSIBILITY OF the SUPREME COURT of Tennessee.**

Supreme Court of Tennessee,
at Knoxville.

Assigned on Briefs Sept. 2, 2009.[1]

Nov. 30, 2009.

1. At appellant Threadgill's request, we originally set this case for oral argument to take place on September 3, 2009. Pursuant to Tennessee Rule of Appellate Procedure 35(a), Threadgill moved to waive oral argument on September 1, 2009. The appellee Board of Professional Responsibility did not oppose the motion. We granted the motion and accepted the matter on briefs by a per curiam Order dated September 2, 2009.

Ralph E. Harwell, Knoxville, Tennessee, for the appellant, John O. Threadgill.

Randall J. Spivey, Nashville, Tennessee, for the appellee, Board of Professional Responsibility of the Supreme Court of Tennessee.

## OPINION

CORNELIA A. CLARK, J., delivered the opinion of the court, in which JANICE M. HOLDER, C.J., and GARY R. WADE, WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., joined.

In this direct appeal of a lawyer disciplinary proceeding involving four separate complaints, we are asked to determine whether the trial court correctly affirmed the hearing panel's Order suspending attorney John O. Threadgill from the practice of law for one year. Mr. Threadgill argues that the hearing panel erred in suspending him because the evidence does not support all the hearing panel's findings of professional misconduct. To the extent Mr. Threadgill did violate rules of professional conduct, he contends that he acted negligently, rather than knowingly. Accordingly, Mr. Threadgill argues that his suspension is an excessive sanction, both in light of his conduct in these cases and in light of the sanctions administered in other, factually similar cases. Mr. Threadgill also maintains that his proceedings were procedurally unlawful because a member of the hearing panel and a lawyer-witness were subsequently disciplined for professional misconduct in other matters. We affirm the judgment of the trial court.

### Factual and Procedural History

Attorney Threadgill was licensed to practice law in Tennessee in 1967 and has engaged in the private practice of law in Knoxville throughout his legal career. Prior to the events at issue in this case, Threadgill was twice disciplined by the Board of Professional Responsibility ("Board"). In May 1994, Threadgill received a private informal admonition[2] for

---

2. Private informal admonitions are deemed confidential and are generally not disclosed publicly. Before a hearing panel, however, "Disciplinary Counsel may submit evidence of prior discipline against the respondent [attorney], including prior private discipline." Tenn. Sup.Ct. R. 9, § 8.2. Thus, these matters are now part of the public record.

paying settlement money directly to a client with knowledge that his client owed a third party and without informing the third party of the settlement. In September 2000, Threadgill again received a private informal admonition for signing a federal pleading prepared by out-of-state counsel that plagiarized language from a prominent treatise.

This appeal arises out of three separate petitions for discipline filed by the Board against Threadgill. The original petition of August 26, 2004 was brought by Disciplinary Counsel based on the complaint of Carol Courtney. Disciplinary Counsel filed a supplemental petition in the same case on October 16, 2004, on behalf of complainants Samedi Rosenzweig and Denise Brenda Moyers.[3] On August 18, 2005, Disciplinary Counsel filed a third petition on behalf of Michelle and Eric Nesbit. All three petitions were consolidated for trial before a hearing panel ("Panel"), appointed pursuant to Tennessee Supreme Court Rule 9, section 8.2.

On April 7 and May 15, 2006, the Panel heard testimony and received exhibits into evidence. The following witnesses testified before the Panel: Carol Courtney; Samedi Rosenzweig; Mitchell Rosenzweig, Samedi's husband; Michelle Nesbit; Eric Nesbit; Nathan Anderson, the attorney who filed a civil lawsuit against Threadgill on the Nesbits' behalf; and Attorney Threadgill. In its Judgment rendered February 23, 2007, the Panel specifically found that Courtney, the Rosenzweigs, the Nesbits, and Anderson were credible witnesses who testified truthfully.

The proof presented to the Panel may be summarized as follows.

### Carol Courtney Matter

Carol Courtney sustained personal injuries in a car accident on April 6, 2000. She retained Threadgill in February 2001 to file a lawsuit on her behalf. Courtney testified that they agreed to a one-third contingency fee arrangement, with Courtney paying the filing fee.[4] The case was settled at mediation in January 2002. The insurance company's representative wrote and delivered the $37,500 settlement check to Threadgill at the mediation. Threadgill deducted his contingency fee, expenses, half of the mediation cost, and the expected amount of subrogation interests of $2,754.20 owed to Travelers Property and Casualty Insurance ("Travelers") and $2,175.21 to United Health Care, a/k/a Health Care Recoveries ("Health Care"). On February 18, 2002, Threadgill's office provided Courtney with a check for the balance of $19,419.01. Courtney testified that, although one of Threadgill's employees verbally explained the disbursements of the settlement proceeds, she never received a written itemization.[5] Courtney also testified that she did receive Threadgill's letter of February 19, 2002, which stated, "We will work with the two insurance carriers to see if we can save some money on their subrogation claim." Courtney also received copies of two letters that Threadgill sent to Travelers's representatives in May 2002, offering to settle the subrogation claim for $2,000. According to Threadgill, he believed that the subrogation claims were resolved "at

---

**3.** Although presented in the same supplemental petition, the Rosenzweig and Moyers matters are unrelated.

**4.** The undisputed evidence establishes that Threadgill never reduced any of these clients' fee agreements to writing.

**5.** Threadgill has maintained that his office prepared a written itemization dated February 18, 2002 and provided that document to Courtney.

some point" after that date, such that he considered the matter closed and sent Courtney's file to an offsite storage location.

Courtney testified that, between May 2002 and August 2003, Threadgill's office did not communicate with her about her case. On February 13, 2003, Courtney wrote to an employee in Threadgill's office, noting that the amount of settlement proceeds held back to pay the subrogation interests would exceed the amount actually paid to those interests.[6] Courtney's letter asserted that Threadgill's office "ha[d] the money in reserve to pay [the subrogation interests] and the remainder should be refunded back to [Courtney]." Courtney wrote to Threadgill's office again on June 23, 2003, requesting "to hear from [Threadgill] as soon as possible to know that [payment of the subrogation interests] is settled and finalized." Courtney further requested to know the "exact amount paid" to Health Care, Travelers, and the mediator, along with "documentation of how the remainder of $5,581.00 [of settlement proceeds] was disbursed."

Courtney testified that Threadgill did not respond to her letters. He did not inform Courtney of the $677.49 payment that he had already made to satisfy Health Care's interest.[7] Courtney testified that she learned about this payment by corresponding directly with Health Care. On June 12, 2003, Travelers wrote to Threadgill accepting the settlement offer. Threadgill neither informed Courtney about this letter nor paid the $2,000 to consummate the settlement. In a letter dated August 4, 2003, Travelers told Courtney that her file remained open and

unpaid and would be referred to an outside collection agency.

Courtney testified that, on August 8, 2003, she spoke with Threadgill, who said that he would retrieve her closed file from the storage warehouse and address the matter immediately. In a follow-up phone conversation on August 11, Courtney confirmed that Threadgill had spoken with a Travelers representative and agreed to send Threadgill a copy of all of her documentation of Travelers's subrogation claim. Courtney next spoke with Threadgill in late September 2003, after Travelers wrote to Courtney that it could not collect from Threadgill the amount due and did not believe that further efforts would yield a recovery. Threadgill asked Courtney to provide a second copy of the same records that she had sent him in August, as her file remained in the warehouse. In follow-up correspondence, Courtney directed Threadgill to pay Travelers the $2,000 and then provide her with the remaining settlement proceeds.

Finally, on October 20, 2003, Courtney directed Threadgill in writing to give her proof of payment to Travelers and send her a check for the remaining settlement proceeds. If Threadgill did not make both payments within ten days, Courtney indicated that she would forward her file to authorities within the department of insurance and the judicial department. Threadgill's last communication with Courtney was a voicemail on October 22, 2003 stating that he was still trying to locate the file in the warehouse so he could resolve the case. The same day, Courtney mailed another letter to Threadgill, objecting to his delay in locating her file. Courtney then wrote to the Board on November 12, 2003.

---

6. Courtney's conclusion presumed that Travelers would accept Threadgill's $2,000 settlement offer.

7. The $677.49 received from Threadgill, in addition to a prior payment made by Travelers, satisfied Health Care's claim in full.

At the Panel hearing Courtney testified that she did not know whether Travelers had ever been paid. Threadgill testified that, when he again communicated with Travelers, it refused payment, explaining it had written off the claim. Once Travelers informed Threadgill that it had written off Courtney's claim, Threadgill admitted that he "sort of was aware" that he owed Courtney money, but he "didn't know what had been disbursed and what hadn't." After his review of the billing file, he "felt like [he] owed Ms. Courtney something, but [he] didn't think [he] knew what that amount was." He did not make any payment.

A bank statement introduced into evidence at the hearing showed that Threadgill's trust account balance as of April 30, 2002 was $1,013.01, less than the amount at issue in this case. In support of his testimony that he was opening a trust account at a different bank from March— May 2002, Threadgill introduced an April 1, 2002 check for $3,900, which was purportedly a transfer of funds to his new trust account. However, Threadgill never complied with the Board's written request for a copy of all trust account checks and statements from February 2002 until December 2003.[8] On the second day of the Panel hearing in 2006, Threadgill introduced into evidence a document memorializing Courtney's release of all claims against Threadgill and his firm for $2,079.71. The release had been notarized that same day.

■ Finding Courtney to be a credible witness and accepting her testimony as true, the Panel concluded that Threadgill did not promptly deliver funds to Travelers or to Courtney, respectively, nor did Threadgill provide an accounting of those funds. Thus, the Panel determined that Threadgill violated Disciplinary Rule[9] ("DR") 9–102(B)[10] and Rule of Professional Conduct ("RPC") 1.15(b).[11] Furthermore, citing Threadgill's trust account balance as of the end of April 2002, the Panel found that Threadgill misappropriated monies belonging to Travelers and Courtney because Threadgill did not maintain those

**8.** The Board made this request on March 3, 2004, more than two years prior to the Panel hearing.

**9.** The Code of Professional Responsibility governs professional misconduct taking place before March 1, 2003. For misconduct on and after that date, the Rules of Professional Conduct govern. *Beard v. Bd. of Prof'l Responsibility*, 288 S.W.3d 838, 850 n. 19 (Tenn.2009); *see* Tenn. Sup.Ct. R. 8, Transitional Rules Governing the Implementation of the Tennessee Rules of Professional Conduct.

**10.** In relevant part, DR 9–102(B) reads:

A lawyer shall:
(1) Promptly notify a client of the receipt of the client's funds. . . .
. . .
(3) Maintain complete records of all funds . . . of a client coming into the possession of the lawyer and render appropriate accounts to the client regarding them.

(4) Promptly pay or deliver to the client as requested by a client the funds . . . in the possession of the lawyer which the client is entitled to receive.

**11.** As relevant to the claims of Courtney and other clients, RPC 1.15(b) reads:

Upon receiving funds . . . in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such funds or other property.
The provisions of RPC 1.15 were amended and renumbered by a July 8, 2009 Order of this Court, and the new language will take effect on January 1, 2010. Herein, we cite to the prior version of RPC 1.15.

monies in a trust account. Thus, the Panel determined that Threadgill also violated DR 9–102 [12] and RPC 1.15(a). [13]

### Denise Brenda Moyers Matter

Denise Brenda Moyers retained Threadgill in 2001 to sue UNUM Life Insurance Company ("UNUM") regarding an allegedly premature cessation of disability payments. [14] The parties agreed to a contingency fee arrangement. The case settled for $7,500 in June 2003. UNUM mailed the settlement check on June 18, 2003. Threadgill admits that, on June 23, 2003, a staff member deposited the check into his general operating account, rather than into his trust account.

In February 2004, Moyers first discovered that her case had settled when she contacted UNUM, which advised that the check had been mailed to her attorney and deposited by him in the prior year. Moyers then contacted Threadgill, who had not consulted her file or contacted her since he deposited the settlement check. Threadgill gave Moyers a check for $5,000. Moyers took the check directly to Threadgill's bank, which initially declined to cash the check because of insufficient funds in the account on which it was drawn. Threadgill testified that, after he spoke with the bank and explained that he had made a deposit the same day which had not yet cleared, Moyers was able to cash the check.

Upset, Moyers communicated to Threadgill that he should not be entitled to collect any fee under these circumstances. Threadgill refunded his $2,500 contingency fee, such that Moyers ultimately obtained all of the settlement proceeds.

The Panel found that Threadgill violated RPC 1.15(a) by failing to keep money owed to Moyers separate from his personal and office accounts. The Panel concluded that the placement of Moyers's funds into Threadgill's operating account further violated RPC 1.15, 1.16, [15] and 8.4. [16] The Pan-

---

12. In relevant part, DR 9–102 reads:
(A) All funds of clients paid to a lawyer ... shall be deposited in one or more identifiable insured depository institutions....
... No funds belonging to the lawyer or law firm shall be deposited therein except as follows:
(1) Funds reasonably sufficient to pay service charges may be deposited therein;
(2) Funds belonging in part to a client and in part presently or potentially to the lawyer ... must be deposited therein, but the portion belonging to the lawyer ... may be withdrawn when due unless the right of the lawyer ... to receive it is disputed by the client, in which event the disputed portion shall not be withdrawn until the dispute is finally resolved.

13. As relevant to the claims of Courtney and other clients, RPC 1.15(a) reads:
A lawyer shall hold ... funds of clients or third persons that are in a lawyer's possession in connection with a representation separate from the lawyer's own ... funds. A lawyer in possession of clients' or third persons' ... funds incidental to representa-

tion shall hold said ... funds separate from the lawyer's own ... funds.
(1) Funds belonging to clients or third persons shall be kept in a separate account maintained in an insured depository institution.... A lawyer may deposit the lawyer's own funds in such an account for the sole purpose of paying bank service charges on that account, but only in an amount reasonably necessary for that purpose.

14. Moyers did not testify before the Panel. In making its findings in this matter, the Panel relied on Threadgill's testimony and the parties' written stipulation of facts.

15. RPC 1.16 pertains to an attorney's mandatory and permissive withdrawal from a client representation and the attorney's obligations to the client upon terminating a representation. The Panel did not specify which section of RPC 1.16 Threadgill had violated. Subsection (d)(5) requires an attorney, upon terminating the representation of a client, to "promptly refund[ ] any advance payment for fees that have not been earned."

el determined that Threadgill's failure to communicate with Moyers about the status of her case through a prompt accounting violated RPC 1.4[17] and 1.15(b). Finally, the Panel found that Threadgill's failure to monitor Moyers's settlement proceeds violated RPC 1.1[18] and 1.3.[19]

### Samedi Rosenzweig Matter

Dr. Samedi Rosenzweig testified that, in June 2003, she owned three veterinary clinics in the Knoxville area with her husband, Dr. Mitchell Rosenzweig. Samedi and Mitchell both testified that, in the latter part of that month, Mitchell told Samedi that he wanted a divorce. Samedi testified that, at the request of a former client who knew Samedi through church, Threadgill spoke with Samedi on Saturday, June 22, 2003 about representing her in the divorce proceedings. Threadgill and Samedi spoke again on Sunday, June 23 and met in Threadgill's office on Monday, June 24. According to Samedi's testimony, Threadgill explained that he would charge $250 an hour. Samedi testified that, on Threadgill's advice, she withdrew $250,000 from the clinics, representing her entire interest in those businesses. She advanced $50,000 to Threadgill, who agreed to place the money in a trust account, draw his fees from that account, and

provide Samedi with a monthly accounting. Samedi testified that Threadgill did not make any reference to a non-refundable fee and that she would not have advanced non-refundable money to Threadgill.[20] In addition to these meetings, Threadgill testified he spent time reviewing various financial documents relating to the condition of the clinics.

According to Samedi's testimony, Samedi called Threadgill on Tuesday, June 25, 2003 to advise that she and Mitchell had reconciled. Samedi testified that she visited Threadgill's office the next day to confirm this decision.[21] Samedi then raised the issue of reimbursement. Samedi testified that Threadgill promised to give her money back, less his fees actually incurred, and to have the bookkeeper issue a check in a week. Although the precise subsequent timeline is subject to conflicting testimony, Threadgill wrote Samedi a check for $25,000 within two months of the Rosenzweigs' decision to reconcile. Samedi testified that she was "sure [the check] was from his personal account." In a July 8, 2003 cover letter accompanying the return of the financial documents, Threadgill wrote concerning the fee arrangement:

16. The Panel did not specify which section of RPC 8.4 Threadgill had violated. The rule's definition of "professional misconduct" includes "violat[ing] or attempt[ing] to violate the Rules of Professional Conduct"; "conduct involving dishonesty, fraud, deceit, or misrepresentation"; and "conduct that is prejudicial to the administration of justice." RPC 8.4(a), (c), and (d).

17. In relevant part, RPC 1.4 states that "[a] lawyer shall keep a client reasonably informed about the status of a matter."

18. RPC 1.1 states, "[a] lawyer shall provide competent representation to a client. Competent representation requires the legal knowl-

edge, skill, thoroughness, and preparation reasonably necessary for the representation."

19. RPC 1.3 states, "[a] lawyer shall act with reasonable diligence and promptness in representing a client."

20. Threadgill testified that Samedi was "delighted" to accept his proposal of a $50,000 flat fee.

21. Threadgill's testimony confirms Samedi's visit but disputes the substance of their conversation. Threadgill testified that Samedi was indecisive, felt pressure from Mitchell's family not to pursue the divorce, and delayed her final decision until the following week.

This firm undertook your representation on a flat fee basis with an initial earned fee due to the unique circumstances. Nevertheless, we have returned to you 50% of that fee.

In spite of our fee arrangement, you should be entitled to an additional refund which I will calculate within the next 30 days.

After receiving the initial $25,000, Samedi testified that she continued to call and meet with Threadgill about obtaining the remaining refund. Because Threadgill repeatedly dishonored oral promises to pay back the remainder, Samedi requested that Threadgill memorialize the promise in writing. Threadgill handwrote the following note on personal stationery:

Sam,

This will confirm that even though I had an agreement with you for a lump sum earned fee for your legal matter I have agreed to return the full amount of your fee. One half has already been paid. The balance will be forthcoming.

John Threadgill

8/11/03

After receiving the letter, Samedi testified that she continued to call and/or visit Threadgill's office at least once a week. Threadgill never honored his written promise to refund the remaining $25,000. Threadgill testified that he changed his mind after subsequent "unpleasant encounters" with the Rosenzweigs. These

encounters included Mitchell's unannounced visit to Threadgill's office on September 12, 2003, which resulted in Threadgill filing a report with the Knoxville Police Department.[22] Also, Samedi visited the Threadgill home and spoke with Threadgill's wife about the remaining payment.[23] Samedi testified that, besides withholding her balance, Threadgill also never provided an accounting of time billed to her matter.

While testifying about the Rosenzweig matter, Threadgill also testified concerning his general financial situation.[24] Threadgill's property has been the subject of a federal tax lien since 1986, and Threadgill has incurred judgments from two commercial landlords[25] and from medical bills[26] following heart surgery.

Finding Samedi to be a credible witness and accepting her testimony as true, the Panel concluded that Samedi's $50,000 transfer to Threadgill was an unearned advanced fee, rather than a non-refundable earned fee. Noting the absence of a written fee agreement, the Panel found that the evidence did not establish "a clear understanding with the client that the fees are earned fees and unrefundable." Tenn. Bd. of Prof'l Responsibility, Formal Ethics Op. 92–F–128(a) (1992); see RPC 1.5(b) (lawyer to communicate fee "preferably in writing"). Accordingly, the Panel concluded that Threadgill's failure to place the $50,000 payment in a trust account violated RPC 1.15(a).

---

**22.** Charges were never filed.

**23.** The parties agree that these encounters took place at Threadgill's office and home, respectively, although they disagree about the tone of the discussions during these encounters.

**24.** Threadgill's financial situation was particularly relevant to the Rosenzweig matter because Mitchell testified that he had hired a private investigator with instructions "to

delve into every aspect of [Threadgill's] life to see what he's doing to other people and how he's hiding assets."

**25.** Threadgill testified that, as of August 2003, the commercial landlords' judgments amounted to just over $140,000.

**26.** Threadgill testified that the judgments from his medical bills amounted to approximately three or four thousand dollars.

The Panel further determined that, by retaining the remaining $25,000 after the refund, Threadgill effectively charged an unreasonable fee and retained advance payment for fees that he did not earn. Thus, the Panel concluded that he violated RPC 1.5(a) [27] and 1.16(d)(5). By not keeping the disputed $25,000 in a trust account until the accounting and severance of Threadgill's and Samedi's respective interests, the Panel also determined that Threadgill violated RPC 1.15(c).[28]

Based on the legal services that Threadgill actually provided Samedi, and "giving [Threadgill] the benefit of the doubt," the Panel concluded that Threadgill earned a fee of $2,500.[29] Therefore, the Panel ordered Threadgill to refund $22,500 of unearned fees to Samedi Rosenzweig.

### Michelle and Eric Nesbit Matters

Michelle and Eric Nesbit ("Nesbits") retained Threadgill to represent them in three matters. The first matter involved defending a federal lawsuit filed by Ohio Clear Title Agency, Inc. against the Nesbits individually and their business, NNBS, Inc., a/k/a AnytimeServices.com ("Ohio Clear Title Matter").[30] In April 2003, the Nesbits met with Threadgill. Because Threadgill previously represented Michelle's brother in establishing a home improvement corporation, Michelle testified that she contacted Threadgill on her brother's recommendation. The parties agree that the Nesbits paid Threadgill a retainer fee of $5,000, and Threadgill entered an appearance on the Nesbits' behalf. The parties also agree that, the following month, the Nesbits' errors and omissions insurer agreed to provide a defense, subject to a reservation of rights based on policy coverage dates, and retained attorney Rick Ladd to represent the Nesbits. When the Nesbits requested that Threadgill refund their retainer and withdraw from the representation, Michelle testified that Threadgill declined, stating that he should remain in the case to make sure that Ladd represented their interests.[31] Until August 23, 2004, when the Nesbits demanded a "detailed accounting" and instructed Threadgill in writing to "cease and desist" from representing them in any matter, Threadgill testified that he continued to bill time to the lawsuit, including the draft of a declaratory judgment complaint against the insurer for ultimately denying coverage under the policy and effectively forcing the Nesbits to pay Ladd's final legal bills.[32] Eric testified that Threadgill was only supposed to protect the Nesbits' rights against the insurance company, and was not supposed to assist them in the underlying lawsuit. The parties agree that Threadgill never refunded any portion of the retainer.

The Nesbits' second legal matter was the private adoption of a child born No-

---

**27.** RPC 1.5(a) states, "[a] lawyer's fee and charges for expenses shall be reasonable." The rule goes on to enumerate ten non-exclusive factors for determining whether a fee is reasonable.

**28.** RPC 1.15(c) states, "[w]hen in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interests."

**29.** The Panel reached this number by determining that Threadgill spent ten hours of time and multiplying by his hourly rate of $250.

**30.** The Nesbits' business provided a traveling notary service for closing loans.

**31.** The Nesbits were ultimately dismissed from the lawsuit after mediation.

**32.** This complaint was never filed. Threadgill also did not file a motion to withdraw prior to August.

vember 3, 2003. Michelle testified that Threadgill initially said he would charge $1,500 instead of his standard $2,500 fee, but she was surprised when Threadgill recouped the "discount" and ultimately exceeded his standard fee by subsequently charging $600 and $650 for "unexpected expenses." The parties agree that, in exchange for these fees, Threadgill appeared at the surrender proceedings in Jefferson County, arranged for the completion of paperwork so the Nesbits could take the child overseas for Christmas, and filed a petition for adoption in Knox County Chancery Court on March 19, 2004.[33] Convinced that Threadgill had unnecessarily prolonged the adoption so he could charge more fees, the Nesbits testified that they later went to the Chancery Court on their own to obtain a certified copy of the final recorded decree and the child's birth certificate.

The Nesbits' third legal matter was a collection action,[34] for which they retained Threadgill in July 2003. Michelle testified that Threadgill said he would charge a flat fee of $500 plus $136.50 in court filing fees. Threadgill did not tell Michelle that, if he had to file a civil action, he would claim one third of the recovery as his fee.[35] After writing at least two letters without a response, Threadgill filed suit in early 2004. The parties agree that the suit resulted in a default judgment being entered against the defendant on March 3, 2004 in the amount of $11,014.36. Michelle testified that Threadgill told her the court would collect the funds, and she provided him with account numbers for executing

the judgment. Michelle testified that, in April 2004, Threadgill told her the court had collected the funds and a check would be forthcoming soon. The Knox County General Sessions Court issued a check payable to Threadgill for $11,014.36 on April 15, 2004.

Michelle testified that Threadgill did not notify the Nesbits about the issuance of the check. She continued to call every week or two, but Threadgill maintained that the money had not arrived from the court. The Nesbits learned the judgment was collected by going to the court clerk's office and obtaining a certified copy of the check. Threadgill then claimed that his secretary must have deposited the check into a business account without his knowledge. Despite regular phone calls throughout June and July, Threadgill did not provide these funds to the Nesbits. To explain why the funds had not issued, Threadgill stated, among other things, that his secretary must have misplaced the check and the bank was making unspecified mistakes with Threadgill's accounts. Also, Threadgill began claiming that he was entitled to a one-third fee from the judgment.

Eric testified that he spoke with Threadgill on August 6, 2004 because Threadgill "had been giving [the Nesbits] the runaround for quite some period of time." Threadgill stated the money would be available in two weeks, and Eric confirmed August 20 as a date certain for obtaining the check. On August 23, 2004 Michelle called Threadgill to remind him of the prior conversation. Threadgill denied

---

**33.** Threadgill subsequently filed an amended petition on May 12, 2004. At the Panel hearing, Threadgill could not recall the reasons for filing the amended petition.

**34.** The record variously refers to the defendant in this collection action as Franklin Title Agency or Franklin Title and Escrow.

**35.** Threadgill testified that his fee would be $500 if they collected without filing a lawsuit, and would be a contingency if a lawsuit was filed.

promising the money to Eric by a date certain. That same day, the Nesbits went to Threadgill's office, where Threadgill accused his secretary of embezzling funds and claimed that he was refinancing his house so he could pay the Nesbits, among others. All parties confirmed that Threadgill agreed to pay the money obtained in the collection action by August 30, 2004.

In a letter dated August 23, the Nesbits confirmed the oral agreement for an August 30 deadline, demanded that Threadgill stop working on all of their matters, and requested a "detailed accounting." On August 25, 2004, the same day that Threadgill signed for receipt of the Nesbits' letter, he left a voice message on Michelle's phone, asking whether the Nesbits wanted him to file a lawsuit against the insurer for ultimately denying coverage in the Ohio Clear Title matter. Threadgill also stated that he was sending out a bill to Michelle's brother for work previously performed for him: whatever Michelle's brother paid on his bill, Threadgill would "endorse over" to the Nesbits' account "to settle some of the difference that [Threadgill] owe[d the Nesbits]." By cover letter dated August 27, 2004, however, Threadgill provided the Nesbits with a series of previously unsent billing statements, showing $12,737.50 of time billed to the Ohio Clear Title matter over the period from April 2003 to August 2004, claiming a one-third fee from the judgment in the collection action, and reporting that the Nesbits actually owed a net balance of $1,011.64.[36] Michelle testified that the billings in the Ohio Clear Title matter contradicted Threadgill's prior representations that there was no billable time on that matter. Threadgill would make such rep-

resentations whenever the Nesbits asked for an accounting on the Ohio Clear Title Matter.

In addition to filing a disciplinary complaint against Threadgill, the Nesbits also retained attorney Nathan Anderson to file a civil action against Threadgill. Attorney Anderson testified before the Panel about the status of the Nesbits' civil lawsuit. Threadgill did not initially file an answer. Anderson testified that, a few days before the first day of the Panel hearing, Threadgill informed Anderson by telephone that Anderson had mailed the notice of default judgment to Threadgill's prior office address rather than his current address and that Threadgill intended to respond to the complaint.[37] Anderson further testified Threadgill had proposed that the Nesbits dismiss their civil action and the Board proceeding so the parties could then settle the dispute over the outstanding debt.

Finding the Nesbits and Anderson to be credible witnesses and accepting their testimony as true, the Panel found that the Nesbits and Threadgill reached a verbal agreement that the Nesbits would pay a $500 flat fee plus $136.50 in court costs for the collection action. The Panel determined that this fee was reasonable. The Panel also found that Threadgill could not claim any fee from the $11,014.36 judgment, nor did the Nesbits agree that Threadgill could apply judgment proceeds to their bill for other matters. Therefore, the Panel concluded that Threadgill misappropriated the $11,014.36 judgment and converted it for personal use by placing the money in his own account. The Panel found that the misappropriation and con-

---

36. At the hearing, Threadgill asserted that the Nesbits owed him more than the $1,011.64 balance on the billing summary because Threadgill had forgotten to include his $1,500 fee for incorporating the Nesbits' business.

37. Anderson testified that he had refiled the motion for default judgment.

version "amount[ed] to criminal conduct and conduct involving fraud, deceit and misrepresentation." The Panel also concluded that this misappropriation and conversion violated RPC 1.15, 1.16(d), and 8.4. The Panel determined that the failure to keep client money and property separate violated RPC 1.15(a). Finally, the Panel found that Threadgill's failure to give "prompt and full" accountings violated RPC 1.4 and 1.15(b).

The Panel concluded that it could not determine whether Threadgill had charged unreasonable fees for the Ohio Clear Title matter and the adoption, respectively. The Panel also could not determine whether the Nesbits should obtain a refund of any portion of the fee for those matters. The Panel did, however, make a specific finding that the Nesbits did not owe Threadgill any additional fees.

### Panel Decision

After hearing testimony on April 7 and May 15, 2006, the Panel issued its judgment on February 23, 2007. In addition to its conclusions regarding the Rules Threadgill violated with respect to each client, the Panel analyzed the relevant aggravating and mitigating factors. The aggravating factors included Threadgill's substantial experience in practicing law and the pattern of misconduct, especially his indifference to making restitution. The lone mitigating factor was Threadgill's active membership in the Knoxville Bar Association and Tennessee Bar Association. At the Panel hearing, Threadgill testified about his chairmanship of various committees; establishment of the Small Firm Section within both organizations; and, for several years, his teaching a seminar on setting up a legal practice in locations throughout the state.

As punishment, the Panel recommended Threadgill's suspension from the practice of law for one year. Prior to reinstatement, Threadgill must reimburse clients for all trust account monies owed for unearned fees. This includes the repayment of $22,500 to Samedi Rosenzweig and $11,014.36 to the Nesbits. Threadgill must also have a knowledgeable accountant review his trust account and all other business/office accounts, complying with all of the accountant's reasonable recommendations. Finally, upon reinstatement, the Panel recommended that the Board appoint an attorney to oversee Threadgill's trust account and business accounts for one year.

### Trial Court Proceedings

Pursuant to Tennessee Supreme Court Rule 9, section 1.3, on April 25, 2007, Threadgill filed his Petition for Writ of Certiorari in Knox County Chancery Court seeking review of the Panel's decision. Threadgill asserted that the Panel erred in its conclusions of law, including its determination to suspend him. The trial was conducted January 14, 2008 on the transcript and record of the Panel proceedings and argument of counsel. No new issues were raised by either party, nor was any additional testimony offered.

On February 6, 2008, the trial court issued its Memorandum Opinion, affirming the Panel's findings and recommendations. The trial court identified "a consistent pattern of failure to communicate with these clients regarding monies due," noting that "the preservation of client funds is a paramount responsibility for every attorney, including strict accountings." The court also rejected Threadgill's claim that his Rules violations were attributable to mere negligence, noting Threadgill's knowledge of his conversion, the length of time elapsed in multiple cases, and the clear lack of sufficient funds available at relevant times. In addition to the factors

cited by the Panel, the trial court noted Threadgill's two prior instances of attorney discipline as additional aggravating factors.

By Order entered April 11, 2008, the trial judge recited that "the Knox County Chancery Court Clerk's Office failed to provide the parties with a copy of the Opinion until March 12, 2008...."[38] The Order further noted that Threadgill had "previously requested [the opportunity] to file a supplemental memorandum regarding ... punishment." The Board did not object.

The trial court allowed supplemental memoranda on the issue of punishment. After months of delay caused by several extensions of time requested by Threadgill, he filed his supplemental memorandum on July 14, 2008. He argued that suspension was too harsh a penalty for his conduct, and that only a private reprimand was warranted.

In a footnote in this supplemental brief, Threadgill noted for the first time and "parenthetically" that the chairman of his hearing panel, Aubrey L. Davis, had himself been temporarily suspended from the practice of law because of a disciplinary complaint filed against him. The gist of the footnote suggested that the Panel's imposition of the sanction of suspension was somehow related to the existence of a complaint against the Panel chairman.

Disciplinary Counsel's Response was filed August 1, 2008. Threadgill filed a Reply on August 13, 2008. After arguing against the penalty already imposed by the trial court, Threadgill again suggested that his own discipline was somehow influenced by the complaint then pending against the hearing panel chairman.

By Order entered September 15, 2008, oral argument on the issue of punishment was conducted October 8, 2008. By Order entered October 20, 2008, the trial court upheld Threadgill's one-year suspension. The trial court found that Threadgill "knew or should have known he was dealing improperly with property belonging to his clients" and caused actual injury by his multiple acts of misconduct. The trial court did not address the issue of subsequent disciplinary proceedings in its Order affirming the one-year suspension.

### Standard of Review

The Supreme Court is the source of authority for the Board of Professional Responsibility and all the Board's functions. *Hughes v. Bd. of Prof'l Responsibility*, 259 S.W.3d 631, 640 (Tenn.2008); *Brown v. Bd. of Prof'l Responsibility*, 29 S.W.3d 445, 449 (Tenn.2000). As part of its duty to regulate the practice of law in Tennessee, this Court bears the ultimate disciplinary responsibility for violations of the rules that govern the legal profession. *Doe v. Bd. of Prof'l Responsibility*, 104 S.W.3d 465, 469–70 (Tenn.2003). Accordingly, this Court reviews disciplinary judgments in light of its " 'inherent power ... [and] fundamental right to prescribe and administer rules pertaining to the licensing and admission of attorneys.' " *Bd. of Prof'l Responsibility v. Allison*, 284 S.W.3d 316, 321 (Tenn.2009) (alteration in original) (quoting *In re Burson*, 909 S.W.2d 768, 773 (Tenn.1995)).

When reviewing a hearing panel's judgment, a trial court considers "the transcript of the evidence before the hearing panel and its findings and judgment." Tenn. Sup.Ct. R. 9, § 1.3. The trial court

---

**38.** But for this failure, the judgment of the trial court should have been final thirty days after its entry. Nothing in the record explains how or when this oversight was discovered by the parties or brought to the attention of the court.

has the discretion to receive additional proof to resolve "allegations of irregularities in the procedure before the panel." *Id.* Rule 9, section 1.3 further sets forth the standard for trial court review of a hearing panel's decision. The same standard likewise applies to this Court's review of the trial court's decision. *Bd. of Prof'l Responsibility v. Love,* 256 S.W.3d 644, 653 (Tenn.2008). Specifically, the hearing panel's factual findings may be reversed or modified only if

> the rights of the petitioner have been prejudiced because the panel's findings, inferences, conclusions or decisions are: (1) in violation of constitutional or statutory provisions; (2) in excess of the panel's jurisdiction; (3) made upon unlawful procedure; (4) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or (5) unsupported by evidence which is both substantial and material in the light of the entire record.

Tenn. Sup.Ct. R. 9, § 1.3. In reviewing the decision below, "the [reviewing] court shall not substitute its judgment for that of the panel [or trial court] as to the weight of the evidence on questions of fact." *Id.* In determining whether "substantial and material" evidence supports the panel's decision, the Court evaluates whether the evidence " 'furnishes a reasonably sound factual basis for the decision being reviewed.' " *City of Memphis v. Civil Serv. Comm'n of Memphis,* 216 S.W.3d 311, 317 (Tenn.2007) (quoting *Jackson Mobilphone Co. v. Tenn. Pub. Serv. Comm'n,* 876 S.W.2d 106, 111 (Tenn. Ct.App.1993)). The Court reviews conclusions of law de novo, without a presumption of correctness. *Beard v. Bd. of Prof'l Responsibility,* 288 S.W.3d 838, 854 (Tenn.

2009) (citing *Union Carbide Corp. v. Huddleston,* 854 S.W.2d 87, 91 (Tenn.1993)).

### Analysis

#### Evidentiary Support for Panel's Conclusions

Threadgill contends primarily that the Panel's findings were unsupported by substantial and material evidence. With respect to all four clients, Threadgill challenges the finding that he acted knowingly and insists that his conduct was merely negligent in each case. Threadgill also challenges other specific findings in the Courtney, Rosenzweig, and Nesbit matters.[39] We address Threadgill's challenges to the findings with respect to each client, and then we globally address Threadgill's state of mind. In our analysis we are mindful that Rule 9, section 1.3 precludes us from weighing the evidence differently from the Panel.

■ In the Courtney matter, Threadgill argues that the evidence shows that he provided Courtney with prompt accountings and maintained adequate funds in his trust account to satisfy Travelers's and Courtney's respective interests. We reject Threadgill's argument, determining that the record provides " 'a reasonably sound factual basis' " for the Panel's conclusion. See *City of Memphis,* 216 S.W.3d at 317 (quoting *Jackson Mobilphone,* 876 S.W.2d at 111). Respecting the Panel's determination that Courtney was a credible witness, we conclude that Threadgill's employee orally reviewed disbursements when Courtney picked up the check in February 2002, but did not provide Courtney with a written itemization. We decline to hold that a spoken overview of disbursements qualifies as an "appropriate ac-

---

**39.** Threadgill's only challenge to the Moyers matter is whether he acted negligently or knowingly.

count[ ] to the client," DR 9–102(B)(3), or a "full accounting," RPC 1.15(b). Also, Threadgill's argument overlooks the multiple instances in 2003 when he ignored Courtney's requests for an accounting of the payment to Travelers and the remainder that she was entitled to recover.

■ As for the balance in Threadgill's trust account, the bank statement introduced into evidence shows a balance of $1,013.01 for the period ending April 30, 2002. This amount was less than the actual amount of Travelers's subrogation interest plus the balance of settlement proceeds owed to Courtney thereafter. Indeed, the balance was less than Threadgill's outstanding settlement offer of $2,000. Threadgill introduced into evidence a cancelled check which was purportedly a transfer into a new trust account, and alleged the transfer of additional monies beyond this amount. However, Threadgill provided no bank statements to support his assertion that the destination account was, in fact, a new trust account, rather than some other kind of personal or business account. Disciplinary counsel requested a copy of all trust account statements for this period well in advance of the Panel hearing, and yet Threadgill provided no such statements. The evidence actually before the Panel provided a reasonable basis for its conclusion that Threadgill did not maintain monies belonging to Courtney and Travelers appropriately in trust accounts.

■ Threadgill asserts that the Rosenzweig and Nesbit matters "are essentially fee disputes." Concerning the Rosenzweig matter, Threadgill points to his testimony that Samedi understood she was paying a non-refundable earned fee. However, Samedi's testimony is exactly contradictory, and the Panel found Samedi to be a credible witness. Threadgill also complains that he is entitled to compensation for time actually expended on Samedi's matter and for his availability to represent her. We do not disagree, but the Panel adequately considered these points when, "giving [Threadgill] the benefit of the doubt" about the quantity of documents reviewed, it awarded him a $2,500 fee for ten hours of work. We reject Threadgill's contention that he somehow earned, or is otherwise entitled to, the remaining $22,500 because of various "unpleasant encounters" after Threadgill's representation of Samedi concluded. In part, the nature of the subsequent encounters was caused by Threadgill's own refusal to address the Rosenzweigs' concerns appropriately.

■ Concerning the Nesbit matter, Threadgill cites his testimony that the Nesbits agreed to apply a share of their proceeds from the judgment in the collection action to their outstanding balance in the Ohio Clear Title case. Again, however, the Nesbits testified to the contrary, and the Panel found the Nesbits to be credible witnesses. We also decline to disturb the Panel's conclusion that the Nesbits do not owe Threadgill more money on the Ohio Clear Title matter or the adoption than the amounts they have already paid. On multiple occasions after they had chosen Mr. Ladd as their attorney in the Ohio Clear Title matter, the Nesbits asked Threadgill to refund the $5,000 retainer and provide them with an accounting. Threadgill consistently refused either request, asserting that he had billed no time to the Ohio Clear Title case. As for the adoption, Threadgill has already received an amount that exceeds his standard fee, and he makes no reasoned argument why he has earned more than that. This evidence provides a reasonably sound factual basis for the Panel's conclusion.

■ After reviewing the entire record, we conclude that Threadgill acted know-

ingly in each case and reject the contention that he acted merely negligently. The virtually identical misconduct perpetrated against multiple clients rebuts Threadgill's contention that he inadvertently lost track of a few cases. Threadgill habitually deposited client funds into personal accounts rather than maintaining those funds in trust accounts; withheld settlement proceeds from clients for unreasonable periods of time; and covered up his actions by failing to provide clients with regular, accurate accountings and/or by lying. Threadgill converted client funds by pocketing the entire amount of a settlement or judgment without informing the client that the case had resolved. The clients were left to their own devices to learn the status of their cases, whether by reviewing court records, contacting the opposing party, or receiving notification that the matter would be turned over to a collection agency. We cannot conclude that the failure to notify multiple clients about the resolution of their cases and the receipt of their funds arose from mere negligence, especially where such failure enabled the cash-strapped Threadgill to retain sums that did not belong to him.

██ Threadgill's misconduct continued even after his clients made him aware of his professional obligations. His refusal to disburse client funds or provide accountings when requested by clients confirms that Threadgill acted knowingly. Courtney communicated with Threadgill throughout 2003, inquiring about the status of Travelers's subrogation claim and requesting an accounting. Threadgill chose not to act promptly, waiting until Travelers had closed its file before attempting to satisfy its subrogation interest and failing to pay Courtney until the Panel hearing nearly three years later. Samedi Rosenzweig visited or called Threadgill's office almost weekly during the summer of 2003, even obtaining Threadgill's written promise to refund her entire retainer. We agree with the Panel that Threadgill was not entitled to a $25,000 fee, where the Rosenzweigs reconciled within a few days of the initial consultation. Finally, after the Nesbits confirmed that the judgment check had issued in their collection action, Threadgill continued to withhold payment by shifting blame to third parties, such as his staff and the bank. Although the Nesbits had requested accountings for over a year, Threadgill refused to produce an accounting until it could serve as a pretense for withholding the Nesbits' money. In light of Threadgill's knowing misconduct with his other clients, we reject his bald assertion that the deposit of Moyers's settlement check into the business account and failure to notify Moyers about the settlement of her case were merely inadvertent acts.

In summary, the record provides overwhelming evidentiary support for the Panel's findings of fact. Our review of the record confirms the Panel's conclusion that Threadgill violated the rules knowingly. We now turn to the Panel's decision to sanction Threadgill by a one-year suspension of his license.

### Appropriateness of Sanctions

██ Threadgill argues that, even if this Court affirms the conclusions of professional misconduct, we should order a private admonition or reprimand, rather than a suspension from the practice of law. Threadgill also challenges the length of his suspension as inconsistent with this Court's precedents. To determine the appropriate level of attorney discipline, we are guided by the *ABA Standards for Imposing Lawyer Sanctions* ("ABA Standards"). Tenn. Sup.Ct. R. 9, § 8.4; *Allison*, 284 S.W.3d at 327. ABA Standards section 3.0 enumerates four factors to con-

sider when imposing a sanction: "(a) the duty violated; (b) the lawyer's mental state; (c) the potential or actual injury caused by the lawyer's misconduct; and (d) the existence of aggravating or mitigating factors." Sections 4 through 8 explain the "generally appropriate" sanction for violations of various professional duties with particular states of mind. Section 9 lists the relevant aggravating and mitigating circumstances. "In deciding an appropriate sanction when an attorney is found to have breached the rules governing his or her profession, we are required to review all of the circumstances of the particular case and also, for the sake of uniformity, [the] sanctions imposed in other cases presenting similar circumstances." *Allison,* 284 S.W.3d at 327 (citing *Bd. of Prof'l Responsibility v. Maddux,* 148 S.W.3d 37, 40 (Tenn.2004)).

We conclude that the Panel properly determined that Threadgill's conduct warranted suspension from the practice of law. Where the attorney has failed to preserve client property, ABA Standards section 4.12 explains that "[s]uspension is generally appropriate when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client." As explained above, we have determined that Threadgill acted knowingly. Threadgill's pattern of misconduct within a short period of time and his failure to honor his professional obligations despite affirmative client requests support the determination of knowing misconduct. He injured his clients by depriving them of the funds they were entitled to receive. Because of Threadgill's knowing misconduct, suspension is the appropriate baseline sanction.

The balance of aggravating and mitigating circumstances supports the decision to suspend Threadgill. Threadgill's experience in the practice of law—nearly four decades prior to the misconduct at issue here—warrants a meaningful suspension.[40] Threadgill also engaged in a pattern of misconduct, violating the same rules in the representation of multiple clients. Threadgill further demonstrated an indifference to making restitution by reimbursing Courtney only after his hearing began and, as far as the record reflects, by withholding the unearned fee from Samedi Rosenzweig and the collection judgment from the Nesbits. In addition to these aggravating circumstances identified by the Panel, the trial court cited Threadgill's two prior disciplinary offenses. We particularly note that the Board previously admonished Threadgill in May 1994 for misconduct similar to the events in this case, that is, the improper allocation of monies following a settlement.

In considering the mitigating circumstances, the Panel cited Threadgill's contribution to the Knoxville Bar Association and Tennessee Bar Association. The ABA Standards do not cite involvement in professional associations among the relevant mitigating factors. Similarly, the ABA Standards provide no mechanism for us to consider the hardship of Threadgill's suspension on the clients whom he is currently representing or the family members whom he financially supports. In summary, after balancing the relevant aggravating and mitigating circumstances, we find no basis to reduce Threadgill's punishment or the length of his suspension.

Our decision to affirm Threadgill's yearlong suspension is not excessive and, indeed, may be viewed as lenient in light of this Court's precedents involving the misappropriation of client funds. For exam-

---

**40.** According to section 2.3 of the ABA Standards, a suspension should generally last at least six months, but not longer than three years.

ple, we have imposed a two-year suspension where an attorney used client funds prior to the deposit of settlement proceeds, deposited settlement proceeds directly into his personal account, repeatedly overdrew his client trust account, and wrote checks from the trust account that were returned for insufficient funds.[41] *Milligan v. Bd. of Prof'l Responsibility,* 166 S.W.3d 665, 672, 674 (Tenn.2005). We described that attorney's behavior as "conduct [that] seriously and adversely reflected on the lawyer's fitness to practice law." *Id.* at 674. Threadgill's misappropriation here is arguably more egregious because, whereas the clients in *Milligan* did not lose any money, Threadgill actively withheld funds that his clients were entitled to receive. Threadgill made restitution to Courtney only after his hearing began, and may make restitution to Samedi Rosenzweig and the Nesbits only under compulsion of these proceedings as a condition of reinstatement. We reached our decision in *Milligan* after considering several precedents involving attorney discipline for mishandling client funds where we imposed suspensions of a year or more. See *id.* at 673–74 (discussing *Bd. of Prof'l Responsibility v. Bonnington,* 762 S.W.2d 568, 571 (Tenn.1988) (affirming four-year suspension of attorney who self-reported withdrawal of funds for personal use from estate administered by the attorney), *Disciplinary Bd. of the Supreme Court v. Banks,* 641 S.W.2d 501, 502, 504 (Tenn. 1982) (imposing one-year suspension of attorney who agreed to invest client's money but inadvertently embezzled that money by lending it to corporations in which attorney held controlling interest without prior notification to the client), and *Dockery v. Bd. of Prof'l Responsibility,* 937 S.W.2d 863, 865, 867 (Tenn.1996) (affirm-

ing two-year suspension of attorney who engaged in pattern of misappropriating and commingling funds and kept records in such disarray that the attorney could not account for disbursement of settlement proceeds)).

In relying on these precedents, we also reject Threadgill's contention that his suspension is excessive because we imposed a shorter suspension in a distinguishable case. Threadgill argues that affirming his yearlong suspension would be inconsistent with our decision in *Maddux,* where we upheld a thirty-day suspension of an attorney who, over a three-year period, converted $92,500 for personal use. 148 S.W.3d at 41–42. The attorney in *Maddux* converted funds from his law firm partnership, rather than from clients. *Id.* at 41. While the misappropriation of funds, whether from clients or a partnership, always involves serious breaches of trust and violations of ethical duties, the misappropriation of client funds implicates the "protection of the public and preservation of the public's confidence in the legal profession [that] are the primary purposes of attorney discipline." *In re Rice,* 99 Wash.2d 275, 661 P.2d 591, 593 (1983); *see also Iowa Sup. Ct. Bd. of Prof'l Ethics & Conduct v. Huisinga,* 642 N.W.2d 283, 287 (Iowa 2002) (publicly reprimanding attorney who misappropriated funds from law firm because "cases warranting revocation reveal much more egregious surrounding circumstances such as criminal conduct ... or conversion of client funds"). Accordingly, we discern no inconsistency in the mere fact that an attorney would receive a longer suspension for misappropriating funds from clients rather than from law firm partners. Furthermore, compar-

**41.** In addition to misappropriating client funds, the *Milligan* attorney forged client signatures on a settlement document and had those forged signatures falsely notarized. 166 S.W.3d at 672.

ing the specific facts of each case, we note that the attorney in *Maddux* benefited from certain mitigating factors: the absence of a prior disciplinary record, testimony from local attorneys concerning the disciplined lawyer's good reputation, and more than four years of delay by disciplinary counsel in filing a petition. *Maddux*, 148 S.W.3d at 42. These factors do not apply to Threadgill, who previously received two informal admonitions, offered no third-party character or reputation testimony at his Panel hearing, and was not the subject of significant delay in the filing of a petition for discipline. In summary, *Maddux* presents different facts and does not warrant a reduction of Threadgill's suspension.

### *"Unlawful Procedure" Involving Subsequent Discipline Against Interested Attorneys*

 Before this Court, Threadgill argues in his brief that the hearing panel's decision was "made upon unlawful procedure" because (1) the qualifications of a member of the Panel are called into question since he himself was the subject of a later disciplinary complaint and was subsequently suspended from the practice of law; and (2) the attorney who testified in support of the Nesbits was later disbarred for perjury. We disagree with his argument.

First, Threadgill's argument, contained in a single paragraph of his brief, is not supported by any evidence contained in the record. Tennessee Rule of Appellate Procedure 13(c) permits appellate courts to consider only those facts established by the evidence in the trial court record and any additional facts that may be judicially noticed or are considered pursuant to Tennessee Rule of Appellate Procedure 14. Threadgill has presented no such facts for consideration.

 The question of chairman Davis's own disciplinary status was raised in the following ways only:

(1) footnote 1 of Threadgill's July 14, 2008 Supplemental Memorandum, submitted to the trial court after its ruling, on the issue of punishment only;

(2) one paragraph on page 2 of Threadgill's August 13, 2008 "Petitioner's Reply";

(3) one paragraph of argument on page 13 of Threadgill's Brief to this Court;

(4) one paragraph and one footnote of argument on pages 6–7 of Threadgill's Reply Brief to this Court.

The law is clear that statements of fact made in or attached to pleadings, briefs, and oral arguments are not evidence and may not be considered by an appellate court unless they are properly made part of the record. *State v. Bennett*, 798 S.W.2d 783, 789 (Tenn.Crim.App.1990); *see State v. Taylor*, 992 S.W.2d 941, 944 (Tenn.1999) (describing the obligation of the party seeking appellate review "to prepare a record which conveys a fair, accurate, and complete account of what transpired with respect to the issues which form the basis of the appeal"). Thus, the bare allegations made in the briefs are not sufficient for this Court to consider.

Similarly, Threadgill has not asked this Court to consider any post-judgment facts under Tennessee Rule of Appellate Procedure 14(b). To the extent he contends that the facts relevant to this issue occurred after the Panel hearing in this case, he must file a motion asking this Court to consider them. He has not done so.

Finally, Threadgill also has not asked the Court to take judicial notice of any facts. In his Reply Brief he refers to "the public records of this Court," but does not state what specific records he references and has not supplied the Court with the

necessary information anticipated by Tennessee Rule of Evidence 201. Thus, the Court declines to guess what information is being referenced.

Even if we take judicial notice of the facts to which we think Threadgill may be alluding, his argument still fails. Records created by the Tennessee Board of Professional Responsibility and found on its website today reveal the following facts relevant to this claim. Aubrey L. Davis, the Panel chair, was the subject of a July 23, 2007 petition for temporary suspension for failure to respond to a complaint. Davis was then temporarily suspended from September 19, 2007 until January 15, 2008.[42] Nathan Anderson, who testified at the Panel hearing, was temporarily suspended on March 19, 2008 and ultimately disbarred on March 2, 2009.

Read in conjunction with Tennessee Supreme Court Rule 9, section 8.1,[43] and the public orders entered in each case, it is reasonable to assume that both Davis and Anderson became aware of the complaints filed against them sometime before each attorney was ultimately sanctioned. Exactly when each learned is, however, a matter of pure speculation. Threadgill reasons that, as the Panel prepared its written opinion, Davis was likely aware of the Board's investigation against him and somehow influenced by that investigation to concur in the panel's findings. Threadgill surmises, for example, that the Board's investigation of Davis's misconduct may explain why the Panel issued its decision

some nine months after the conclusion of the hearing, rather than within the fifteen-day period prescribed by Tennessee Supreme Court Rule 9, section 8.3. However, Threadgill presents no proof to support this due process concern.

Threadgill concedes that the Panel's procedure was not "unlawful" in the sense that it affirmatively violated some provision dictating the composition of the hearing panel. *See Tidwell v. City of Memphis*, 193 S.W.3d 555, 560, 564 (Tenn.2006) (finding unlawful procedure in case governed by the Uniform Administrative Procedures Act ("UAPA") [44], where statute expressly prohibited initial decisionmaker from serving on hearing panel and guaranteed a petitioner's right to appear through counsel). Indeed, Threadgill acknowledges that the Court's rules are silent on the qualifications of panel members. Nonetheless, Threadgill argues that his procedural due process rights were somehow violated because his hearing panel included an attorney who was later found to have violated the Rules of Professional Conduct.

■ We reject Threadgill's contention because, like the UAPA, Rule 9 does not vest the power of final review in the hearing panel. Instead, Rule 9 allows the disciplined attorney (or the Board) to seek review of the Panel's decision before the chancery or circuit court and then appeal directly to this Court. Even if subsequent disciplinary action against a Panel member somehow infected the Panel's decision in

---

42. We decline to discuss subsequent professional discipline against Davis, where the public record reflects that the Board initiated proceedings more than one year after the Panel issued its judgment in this case.

43. In relevant part, this section of the Rule states, "All complaints must be submitted in writing.... The Board shall provide the respondent with a complete copy of the original complaint."

44. The UAPA is relevant here because its standard for judicial review of an agency's final decision in a contested case "is virtually identical" to our standard for reviewing the decision of the Panel and trial court under Tennessee Supreme Court Rule 9, section 1.3. *Love,* 256 S.W.3d at 653 (citing Tenn.Code Ann. § 4–5–322(h) (2005)).

an earlier disciplinary hearing,[45] the trial court and this Court remain available to reverse or modify that decision. The UAPA satisfies procedural due process standards by providing chancery court review of agency decisions. *Bobbitt v. Shell,* 115 S.W.3d 506, 510 (Tenn.Ct.App.2003) (citing *Watts v. Burkhart,* 854 F.2d 839, 841 (6th Cir.1988)). By providing comparable review of hearing panel decisions, Rule 9 likewise satisfies the requirements of due process. We reject Threadgill's procedural challenge to the hearing panel's conclusions.

For the same reasons, we are not persuaded by Threadgill's arguments concerning witness Anderson. The Board's current publicly available records show that this Court suspended Anderson on March 19, 2008, and a press release was issued on March 24, 2008. Threadgill, however, did not raise Anderson's possible misconduct before the trial court—neither in the July 14, 2008 supplemental memorandum on punishment nor the August 13, 2008 reply. Based on this timeline, Threadgill appears to have waived the issue of Anderson's disciplinary proceedings by failing to raise that issue in the trial court.[46] Even if Anderson's record of professional discipline was not publicly available during the trial court proceedings, Threadgill's argument fails on the merits. Threadgill offers no explanation how Anderson's testimony in this case prejudiced his rights by causing the Panel's decision to be procedurally unlawful. Although the Panel found Anderson to be a credible witness, none of the Panel's findings depend solely on Anderson's testimony. Indeed, besides a passing reference to the Nesbits' civil lawsuit against Threadgill, the Panel made no findings pertinent to the subject matter of Anderson's testimony. All of the Panel's findings are fully supported by the testimony of the Nesbits, whom the Panel found to be credible witnesses.

While we firmly reject Threadgill's argument that his Panel hearing was compromised by unlawful procedure, we conclude our analysis by emphasizing that we take seriously the integrity of attorney disciplinary proceedings in Tennessee. We regret those instances when attorneys standing in judgment of their peers are themselves subsequently found in violation of the rules that govern our profession. We aspire to a system where Panel members are of the highest ethical character and scrupulously refrain from even the appearance of professional misconduct in their own practice of law. Nonetheless, where a disciplined attorney may obtain two levels of review of the Panel's judgment, the subsequent discipline of a Panel member cannot automatically negate the outcome of all the prior disciplinary proceedings where that attorney served on the Panel. In this case, for example, the Panel's judgment is independently supported by the decision of the other two Panel members, against whom Threadgill alleges no procedural improprieties. Furthermore, and perhaps most importantly, the subsequent professional

**45.** We emphasize that the record before us shows no disciplinary action against Davis during the relevant time period. Threadgill concedes that he is relying exclusively on the Board's public records, including Davis's temporary suspension in September 2007. That suspension came some seven months after the hearing panel rendered its decision and more than a year after the conclusion of the hearing itself. The Board's public records do not establish when the Board may have initially received a complaint against Davis or when Davis became aware that he was under investigation.

**46.** The Board does not argue that Threadgill waived this issue.

misconduct of a Panel member does not excuse a disciplined attorney's failure to comply with longstanding rules of evidence and appellate procedure. The integrity of our system likewise requires consistent enforcement of those rules among all parties appearing before this Court.

### Conclusion

For the reasons stated above, we affirm the trial court's judgment in all respects, including Threadgill's one-year suspension from the practice of law and the conditions attached to any request for reinstatement. Costs of this appeal are assessed to John O. Threadgill, and his surety, for which execution may issue if necessary.