IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
March 7, 2023 Session

## MARTRICE THOMAS v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
No. 15-03428          Chris Craft, Judge

———————————————————

**No. W2022-00887-CCA-R3-PC**

———————————————————

A Shelby County jury convicted the Petitioner, Martrice Thomas, of first degree premeditated murder. The Petitioner appealed her conviction, and this court affirmed the trial court's judgment. *State v. Thomas*, No. W2017-02489-CCA-R3-CD, 2018 WL 6266277, at *1 (Tenn. Crim. App., Nov. 29, 2018), p*erm. app. denied* (Tenn. March 28, 2019). On April 6, 2020, more than a year after the final judgment, the Petitioner filed a petition for post-conviction relief, alleging that her trial counsel was ineffective, and the post-conviction court denied relief, finding that the Petitioner had received the effective assistance of counsel. The Petitioner appealed, and we remanded the case for consideration of the one-year post-conviction statute of limitations. After a hearing, the post-conviction court determined that due process required the tolling of the statute of limitations. The Petitioner subsequently filed a notice of review, requesting this court complete review of the appeal. After review, we affirm the post-conviction court's denial of post-conviction relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, P.J., and ROBERT H. MONTGOMERY, JR., J., joined.

Phyllis Aluko, Shelby County District Public Defender and Barry W. Kuhn, Assistant Public Defender Memphis, Tennessee, for the appellant, Martrice Thomas.

Jonathan Skrmetti, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Steven J. Mulroy, District Attorney General; and Karen Cook, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I.**

## A. Procedural History

The Petitioner filed a post-conviction petition alleging ineffective assistance of counsel on multiple grounds. After a hearing, the post-conviction court denied relief, finding that the Petitioner had not proven her allegations by clear and convincing evidence. The Petitioner appealed. Upon review, we noted that the Petitioner's conviction became final on March 28, 2019, and the Petitioner filed her petition for post-conviction relief on April 6, 2020, more than a year after the date of the final action of the highest state appellate court to which the appeal was taken. The late filing of the petition was not addressed by either party or the post-conviction court. We remanded the case for consideration of whether tolling the post-conviction statute of limitations was warranted.

On remand, the post-conviction court held a hearing on August 22, 2023, and found that the petition's late filing "was not due to the fault of the petitioner, but due to the fault of her attorney." Citing *Whitehead v. State*, 402 S.W.3d 615, 631 (Tenn. 2013), the post-conviction court found that the petition was not timely filed, but that the statute of limitations should be tolled for due process reasons. The State did not oppose the post-conviction court's finding. The Petitioner filed a notice of review with this court requesting that we complete review of the appeal in light of the post-conviction court's finding that the statute of limitations should be tolled. We now consider the Petitioner's remaining issue of ineffective assistance of counsel.

## B. Facts

On July 16, 2015, a Shelby County grand jury indicted the Petitioner for the first degree premeditated murder of her boyfriend, Willie Harris. Following a jury trial on September 21, 2017, the jury convicted the Petitioner of first degree premeditated murder. The trial court sentenced her to life imprisonment in the Department of Correction. The Petitioner appealed, arguing that the evidence was insufficient to sustain her conviction. *State v. Thomas*, 2018 WL 6266277, at *1. This court affirmed the trial court's judgment, finding that the evidence was sufficient to sustain the Petitioner's conviction.

This court on direct appeal summarized the facts presented at trial as follows:

> The [Petitioner] and the victim began dating in late December 2014, and the victim moved into the [Petitioner]'s home a month later. The [Petitioner] and the victim had repeated physical and verbal arguments during their relationship, and on February 16, 2015, the victim recorded the [Petitioner] during one of their arguments. On the recording, [the Petitioner] threatened, "I'm going to kill [the victim], because he playing in my motherf****** house with him and his n*****s and he gave another b****

2

something for Valentine's Day. I'm going to kill [the victim]. I own a .38 and a .40." The next day, February 17, 2015, the [Petitioner] shot and killed the victim.

At trial, Eddie Harris testified that the victim had told him days before the shooting that the [Petitioner] had "found a receipt . . . that he bought his ex-girlfriend something for Valentine's Day." Mr. Harris stated that he went to the [Petitioner]'s house on February 17, 2015, to help the victim and his disabled uncle move out of the home. Another friend, Eddie Niles, arrived approximately fifteen minutes later to help with the move. The [Petitioner] had gone to the bank to withdraw money that she owed the victim, and he, Mr. Harris, and Mr. Niles smoked marijuana while awaiting her return. Mr. Harris testified that the [Petitioner] returned without the money, saying that the bank was closed and the ATM was broken. The victim and the [Petitioner] then fought about the money, and Mr. Harris placed himself "in-between them because [he] knew [the Petitioner] had them [sic] guns." The victim took the [Petitioner]'s car keys and said he would return them when she gave him the money, though Mr. Harris testified that the victim would have given the keys back if asked. During the argument, Mr. Harris tried to offer solutions.

Mr. Harris testified that the victim then picked up the dog he shared with the [Petitioner], threw it against the wall, and "started stomping the dog." The [Petitioner] then asked Mr. Harris to go to the bank with her and then went into her bedroom. Mr. Harris and the victim then relaxed on the couch while Mr. Niles stood by the front door, as the [Petitioner] did not want him in her home. While Mr. Harris and the victim were sitting on the couch, the [Petitioner] suddenly came out of her bedroom and said "some s*** like, 'You got me f***** up'" while pointing a gun at the victim. Mr. Harris and the victim "jumped up" from the couch, and Mr. Harris repeatedly said to the [Petitioner], "You can't do that." As Mr. Niles made a move to get the gun away from the [Petitioner] and Mr. Harris tried to "ease up on her," the [Petitioner] fired the gun, striking the victim. Mr. Harris stated that the victim fell as he was shot, and he then got up and ran outside as the [Petitioner] fired a second shot.

After the second shot, the [Petitioner] asked, "Where the other mother****** at?" and Mr. Niles ran past the [Petitioner], following the victim outside. Mr. Harris was then able to take the gun out of the [Petitioner]'s hands and tell Mr. Niles to call 911. Mr. Harris testified that he then demanded the [Petitioner] tell him where her other gun was hidden,

3

because he "knew she had two guns." While he was looking for the second gun, Mr. Niles told Mr. Harris that he had located the victim, and Mr. Harris testified that they found the victim lying face down in the street. Mr. Harris and Mr. Niles then drove the victim to the hospital, where he later died from the gunshot, which had penetrated his lungs and spine. Mr. Harris testified that Mr. Niles, the victim, and he were unarmed, though he asserted he would have used a gun for self-defense if he had had one. He further stated that he had never seen the [Petitioner] and the victim get into a physical altercation.

Mr. Niles'[s] testimony at trial largely echoed that of Mr. Harris. He stated that he went to the [Petitioner]'s house on February 17, 2015, to help the victim move out of the house and "to prevent anything from happening, arguing, or fighting, anything like that." He reiterated that after the [Petitioner] returned without the money, she and the victim fought, he threw the dog against the wall, and he took her keys. The [Petitioner] then stated that she would go back to the bank, went into her bedroom, and then emerged with a gun. Mr. Niles testified that the [Petitioner] also said, "B*****, I told you I wasn't nothing to play with[,]" before pointing the gun at the victim. The [Petitioner] stood approximately fifteen to twenty feet from the victim as she aimed the gun at him, and Mr. Niles tried to grab the gun away from her when she fired the first shot. The [Petitioner] repeated "[Y]eah I told you" and stepped forward to fire the second shot, giving Mr. Niles the opportunity to run past her and hide in another room. Mr. Niles testified that the [Petitioner] shouted, "Where the other mother****** at?" and knew that she was referring to him. In response, Mr. Niles testified that he became afraid and barricaded himself in the room where he was hiding by "slid[ing] the couch behind the door," and he "threw [his] hoodie on [his] head and tied it up around [his] face" because he was "going to dive out the [closed] window" if the [Petitioner] tried to get into the room.

Mr. Niles testified that when he heard Mr. Harris yelling from the hallway, he ran outside and saw the victim face down in the street. Mr. Niles stated that when he got to the victim, his "hands was [sic] locked up and he was looking at [Mr. Niles] trying to talk and he was just [gasping for air]." Mr. Niles then went back into the house to tell Mr. Harris, who was searching for the [Petitioner]'s other gun, that they needed to get help for the victim. When he went back into the house, Mr. Harris had the [Petitioner] "pinned on the couch" and Mr. Niles took the gun away from her and put it in his pocket. Mr. Niles called 911, and Mr. Harris and the victim's cousin and neighbor Frank helped him place the victim in Mr. Harris'[s] car. Mr. Niles testified that the [Petitioner] had grabbed her other gun, and she told Mr.

4

Niles he needed to return the gun he had taken from her. The [Petitioner] had called 911, and police officers arrived as they were taking the victim to the hospital. Mr. Niles testified that he had never seen a physical altercation between the [Petitioner] and the victim.

Dr. Paul Benson, the forensic pathologist who performed the victim's autopsy, testified as an expert witness. He affirmed that the bullet entered the victim's lower left side and lodged behind his right shoulder, hitting the left lung, spine, and right lung before stopping. . . . He testified that this wound would have, "by perforating both of the lungs, caused bleeding into both sides of the chest inbetween [sic] the lung and the chest wall" and been fatal due to the victim's "bleeding out into the chest cavity from the wound."

Officer William Lane of the Memphis Police Department testified that he responded to reports of a shooting at the [Petitioner]'s home on February 17, 2015. When he arrived, the [Petitioner] "started saying something along the lines of – it was self-defense." Officer Lane's partner, Officer Hilton, then placed the [Petitioner] in their squad car, and they secured the scene and waited for detectives to arrive.

Officer David Payment of the Memphis Police Department testified at trial that he was one of the Crime Scene Investigators assigned to investigate the shooting. He first responded to the hospital where the victim was taken to photograph the victim and the car he was transported there in. Officer Payment testified that he did not find any weapons or other evidence in the car, with the exception of what appeared to be blood stains. Officer Payment then went to the [Petitioner]'s home to process the crime scene. He testified that he found the [Petitioner]'s two guns on the couch, two spent bullet casings, and more unused bullets on the bed in the bedroom. Officer Payment then went to the Homicide office to photograph the [Petitioner], based on her assertion of self-defense. The [Petitioner] told Officer Payment where on her body she was injured, and he testified that he observed bruises on the [Petitioner]'s arms, "slight subcutaneous bruising" on her neck with the aid of an alternative light source, and no bruising on her face.

The [Petitioner] testified on her own behalf at trial. She stated that her relationship with the victim became abusive around January 26, 2015. She affirmed that she had threatened to kill the victim on the recording he had made of her. She denied that she owed the victim any money and instead asserted that he felt she owed him money because she had asked him to move out of her home. She stated that on February 16, 2015, they agreed that he

5

would move out if she paid him $2000. The [Petitioner] testified that the next morning, the victim "slammed [her] head into the wall . . . several times." She asserted that the victim, Mr. Harris, and Mr. Niles all had guns when she got home from the bank on February 17, 2015, though she did not know what happened to them.

After the victim threw their dog into the wall, the [Petitioner] testified that she "tr[ied] to make a run for it[,]" but was blocked by Mr. Niles standing by the front door with a gun. The [Petitioner] also testified that the victim "charged at [her]" and she "reacted and [she] shot, because [she] was afraid." She further asserted that "[w]hen he charged towards [her], [she] took [the gun] out of her purse" and "fired the gun [while] [the victim] was still standing there." She explained that she fired two shots because she "was trying to just scare [the victim] into stopping him from charging at [her]." The [Petitioner] testified that she never threatened Mr. Harris or Mr. Niles.

On cross-examination, the [Petitioner] testified that she had been on medical leave from her employment for approximately a year and had just filed for bankruptcy when she moved into her home in January 2015. The victim moved into the home soon after. The [Petitioner] testified that the victim "wasn't welcome" to sleep in her bedroom "most of the time, because of the arguing and bickering." She stated that Mr. Niles "was not welcome in [her] house" because he "kept introducing [the victim] to other women[.]" The [Petitioner] affirmed that the victim had sold his vehicle, furniture, and "some other stuff" prior to moving in with her, and was to give her money out of his disabled uncle's disability check every month. She testified that the victim had "put his hands on [her] about four times[,]" and though she called the police after one of those incidents, the victim was never arrested.

The [Petitioner] further testified that she did not owe the victim money, though the State played back the recording that the victim had made of her the day before the shooting, in which she stated that she owed him $1600. She testified that the victim had given an ex-girlfriend a gift for Valentine's Day, and she affirmed that "in the first . . . thirty seconds" of the recording, she said four times that she "[was] going to kill [the victim]." Later in the recording, the [Petitioner] and the victim also discussed his selling the Xanax pills she had been prescribed, and the [Petitioner] said, "I gave you a whole bottle of pills and I ain't seen nothing, a bottle of pills and I haven't seen but god**** $65.00 from it[.]" The [Petitioner] maintained that despite her statement on the recording, she was "not selling [the pills]

6

for profit[.]" She could also be heard saying "I want you to hit me" multiple times during the recording.

The [Petitioner] further stated that the victim "punched her in the face" multiple times on the morning of the shooting. She testified that she was "easy to bruise" and had received at least one of the bruises on her arms from a man named "Montana." Although the [Petitioner] asserted that all three men had guns at the time of the shooting, she conceded that she did not mention their guns in her call to 911 or her police report, instead only mentioning to 911 that she wanted to report the gun that Mr. Niles and Mr. Harris had taken away from her as "stolen."

On redirect examination, the [Petitioner] stated that the victim was the only one who could have caused the bruises found on her body. On recross examination, the [Petitioner] stated that some of the bruises "could have been" caused by "Montana." She maintained that she had bruising to her face, even after affirming that Officer Payment had not observed any bruising to her face, and she had not told him that there might be bruising to her face.

*Id.* at 1-4.

On April 6, 2020, more than a year after the supreme court denied review, the Petitioner filed a post-conviction petition, claiming that she received the ineffective assistance of counsel. Specifically, as relevant to this appeal, she asserted that her trial attorney ("Counsel") was ineffective because he failed to present her treating psychiatrist as a witness at trial.

The post-conviction court held a hearing, during which the parties presented the following evidence: The Petitioner's mother, Barbara Cole, testified that, in 2014, the Petitioner's boyfriend at the time had held her hostage for five days, following which, the Petitioner moved in with Ms. Cole "full-time." Ms. Cole described the Petitioner as "extremely jumpy." She elaborated providing the following examples:

[I]f I came in the room I'd have to tell her it's me. She would just wake up, you know, screaming and just not herself, and so I said - - I have to tell her, "Martrice, it's Mommy, and I'm just coming to get in the kitchen." Because she was sleeping on my couch in the living room.

Ms. Cole said that this behavior was out of character for the Petitioner, whom she described as "very smart" and gainfully employed as a certified medical assistant.

7

Ms. Cole testified that within the same year that the Petitioner had been abducted, she was robbed at gunpoint exiting a nail salon. This encounter also contributed to the change in the Petitioner's behavior. Ms. Cole said that, during this time, the Petitioner began having trouble at work and sought help from a psychiatrist. In 2017, the Petitioner was still experiencing "flashbacks."

Ms. Cole recalled that, after the Petitioner retained Counsel, Ms. Cole inquired about whether Counsel intended to introduce evidence that the Petitioner was diagnosed with post-traumatic stress disorder. According to Ms. Cole, Counsel responded, "I'm not representing you" and turned his back on her.

On cross-examination, Ms. Cole confirmed that the Petitioner moved out of her house to live with a friend before moving in with the victim. She stated that she had never been to the home the Petitioner and the victim shared because she did not approve of the victim.

David Allen testified as an expert witness in the field of general psychiatry. Dr. Allen conducted a medication evaluation of the Petitioner on January 22, 2014, and had his last appointment with her on January 21, 2015. Dr. Allen's treatment notes were entered as a sealed exhibit. The Petitioner reported to Dr. Allen that she broke up with her boyfriend after learning that he had lied about his identity. He responded with kidnapping her and tying her to a bed for three days. When she tried to escape, he attacked her with a hammer and had started to cut her throat when the police made entry. She also reported that, shortly before her evaluation with Dr. Allen, she had been the victim of an armed robbery by three men with guns. Dr. Allen stated that he had no independent verification of this trauma but that he had no reason to doubt the Petitioner's statements to him. The Petitioner developed anxiety and "mild panic attacks," which occurred three times a week. Dr. Allen initially diagnosed her with acute stress disorder, but later changed it to post-traumatic stress disorder.

Dr. Allen testified that the Petitioner's symptoms were ongoing but that she did improve for a period of time. During this period of improvement she stopped taking her prescribed medication, but the symptoms returned. He described the Petitioner as agitated and scared all the time due to traumatic experiences, causing her reactions to stressful situations to be less controlled. Dr. Allen stated that he was unaware that the Petitioner was going through a trial, and no attorney representing the Petitioner ever contacted him regarding the case. He agreed that, had he testified at trial, his testimony would have been substantially similar to his testimony at the post-conviction hearing.

Dr. Allen explained that a person with a history of trauma was more likely to overreact when faced with a threat; however, he stated it would be "hard to predict." When

8

asked to what extent did the Petitioner's condition contribute to her actions in this case, he responded, "Well, under threat when you have a history of trauma you're more than likely to overreact or maybe react more appropriately than she had in the past with violent men." He agreed that the Petitioner's mental health condition would "[p]robably" affect the Petitioner's ability to think rationally in the face of a threat.

On cross-examination, Dr. Allen agreed that the Petitioner had never been violent before. He reiterated that it would be difficult to predict the Petitioner's response in any given situation and that he could not know exactly how she would respond in any given situation. Dr. Allen summarized his interactions with the Petitioner as having seen the Petitioner "a few times" and prescribed different types of medication, mostly for panic symptoms. Dr. Allen read from his January 21, 2015 patient notes about a change in the Petitioner's mental status. "Patient calmed down considerably on increased Zoloft. No panic attacks since last visit. She moved, living alone, which makes her somewhat nervous. But her post-traumatic stress disorder symptoms seem to be softening." Dr. Allen agreed that he had no direct knowledge of the Petitioner's mental status on the day of the shooting, February 17, 2015, approximately a month after he wrote the note about her improvement. Dr. Allen testified that any opinion on her mental status on the date of the shooting would be speculative.

On redirect examination, Dr. Allen explained that panic and rage are very similar physiologically, so people may do things that they would not normally do under certain stressful situations or during an attack. He agreed that the Petitioner's panic attacks were relatively brief and likely would not have lasted longer than half an hour but it was possible to experience lengthier panic attacks.

The Petitioner testified that Counsel suggested that she testify at trial. She responded by asking whether he planned "to use any of the other witnesses?" Counsel stated that they "didn't need them." Before the Petitioner testified, the trial court instructed her about what she could and could not testify about based upon the outcome of pre-trial motions filed by the parties. The Petitioner said the restrictions caused her to be vague in her responses, and she found it stressful to testify under those circumstances. She believed that the restraint in her testimony was perceived negatively by the jury, and she would have had a better outcome had she been able to testify freely. On cross-examination, the Petitioner stated that she testified because Counsel told her to testify.

Counsel testified that he had been practicing criminal defense for twenty-two years. Counsel attempted to negotiate a settlement with the State but was unable to do so. He described the Petitioner's case as the "[s]trongest self-defense case [he] had ever seen." Counsel recalled that there were multiple 404(b) motions that he both filed and to which he responded. The trial court ruled on the motions allowing some of the evidence in and

excluding other portions. He communicated the outcome of the motions to the Petitioner whom he met with "pretty regularly."

Counsel testified that he was aware of the Petitioner's history with traumatic events. He stated that he was the third attorney to handle the Petitioner's case and received a 1500-page file on the case when he was retained. He confirmed that his office contacted Dr. Allen but because three or four attorneys worked on the Petitioner's case, he could not say specifically who made contact. Based upon his interaction with the Petitioner, he did not believe a mental health defense would have been a good strategy. He explained that the Petitioner appeared nervous but otherwise presented as well-spoken, logical, and rational, and was helpful in assisting in her defense. Because it was the Petitioner's first exposure to the criminal system, Counsel believed any signs of nervousness were to be expected.

Counsel testified that he was familiar with the process of presenting a mental health defense but saw no indications warranting such a defense in this case. Counsel stated that it was a strategic decision not to introduce any evidence of medical diagnosis because he did not allow the State to introduce contradictory and possibly damaging testimony from its expert.

About the Petitioner's decision to testify at trial, Counsel agreed that he encouraged the Petitioner to do so in support of their self-defense strategy. He explained, "on a self-defense case it's almost critical for the defendant to testify because they're the only person who can speak to their state of mind and that's a critical element of the defense." Counsel confirmed that he prepared the Petitioner to testify. He stated that he was "very comfortable" with the Petitioner as a witness. Counsel believed that the Petitioner understood the importance of her conveying what had occurred and that the Petitioner was prepared. Counsel maintained that the Petitioner's testifying was the best course of action at trial and, in hindsight, still believed that to be true. He said, "it was and is the best self-defense case I've ever encountered. It was legitimate."

On cross-examination, he agreed that he had never tried an adult case with mental health issues but that he was familiar with the process through his work in juvenile court. He summarized the process of obtaining and paying for an expert to evaluate a defendant's mental health. He did not pursue expert testimony in this case because he felt strategically it would be a poor decision that would allow for the State's expert to testify and potentially introduce evidence adverse to the defense strategy. Counsel confirmed that he obtained funds for an investigator.

Counsel testified that the State never made an offer for settlement in the case but the prosecutor had told Counsel that Counsel could make an offer. Counsel did not do so because he believed that the self-defense claim was strong. Counsel stated that he had

10

reviewed Dr. Allen's records introduced at trial but could not recall if there were other records related to Dr. Allen that he also reviewed. Although Counsel did not have any independent recollection of conversations with the Petitioner about her mental health, he stated that he was "sure" they had discussed her mental health issues.

After hearing the evidence, the post-conviction court issued a written order denying relief. It is from this judgment that the Petitioner appeals.

## II. Analysis

On appeal, the Petitioner asserts that Counsel was ineffective for not presenting evidence of the Petitioner's mental state, specifically Battered Woman Syndrome, and that Counsel failed to adequately investigate Battered Woman Syndrome. The State asserts that Counsel made a strategic decision not to call at trial the Petitioner's psychiatrist and, therefore, the Petitioner has not proven this allegation by clear and convincing evidence.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2018). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2018). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997)). A post-conviction court's factual findings are subject to a *de novo* review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely *de novo* review by this Court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by

11

the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "'The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" *House*, 44 S.W.3d at 515 (quoting *Goad*, 938 S.W.2d at 369).

12

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

In the Petitioner's post-conviction petition she claimed: (1) Counsel failed to pursue plea negotiations on her behalf; (2) Counsel "failed to call a psychiatrist, Dr. David Allen, at trial to give evidence regarding the state of her mental health a month prior to the killing"; (3) appellate counsel failed to challenge the denial of her 404 motion; and (4) Counsel failed to call "Frank" as a witness at trial. In the written order, the post-conviction court identified a fifth issue raised during the hearing, which was that Counsel forced the Petitioner to testify at trial. The post-conviction court addressed this issue, even though not listed in the petition, because it was testified to at the hearing and fell under the general ground of ineffective assistance of counsel. On appeal, however, the Petitioner maintains only issue (2), that Counsel failed to call Dr. David Allen.

In its written order denying relief, the post-conviction court made the following findings:

> Dr. Allen was called as a witness at the first hearing on this petition. He had retired his license at the time of the petition, but had been a licensed psychiatrist at the time he saw the [P]etitioner for the purpose of "medication evaluation." He testified that he had seen her for the first time on January 22, 2014 and his last visit with her was January 21, 2015 (a month before the homicide). He was not seeing her for therapy, but just for medication, and was not looking into the underlying causes of her issues. He stated that she told him she had been kidnapped by a boyfriend who had been lying about his identity, who then kidnapped her and tied her to a bed for three days, attacked her with a hammer and tried to cut her throat. She was saved by her son, who was tracking her, and the boyfriend was given 85 years in jail. After that, she was next robbed by three men with guns. The doctor testified that he had no independent verification of any of this. She told him she was having panic attacks three times a week. He diagnosed her as having Post-traumatic stress disorder and stated that because of this she would be on average "more reactive" and "her trigger would probably be much less controlled . . ."

He was then asked as follows:

13

Q. Okay. If put into a situation where she felt like she was in physical danger, how would she have reacted differently than a neuro typical person?

A. Well. She'd probably be more reactive. Again, it's hard to predict - -

Q. Right.

A. - - because her symptoms were coming and going. But, again, with her history of trauma and abusive relationships, I would imagine that she would be very frightened.

He then testified that he was treating her as a private patient and no one ever contacted him about testifying at the trial. When asked whether her condition may have contributed to her actions during the homicide, he stated that "Well, under threat when you have a history of trauma you're more than likely to overreact or maybe react more appropriately than she had in the past with violent men."

On cross-examination, the Doctor admitted that the [P]etitioner could act normally as well in stressful situations, and that it was hard to predict. He also put in his medical notes the last time he saw her on January 21st (less than a month before the homicide) the following notation: "Patient calmed down considerably on increased Zoloft. No panic attacks since last visit. She moved, living alone, which makes her somewhat nervous. But her post-traumatic stress disorder symptoms seem to be softening."

From the technical record, the General Sessions judge that handled her preliminary hearing had the [P]etitioner mentally examined after her arrest, and received a letter filed in the court jacket dated March 9, 2015, three weeks after the homicide, from Dr. Wyatt Nichols finding her competent to stand trial. It stated in addition as follows:

> With regard to [the Petitioner]'s mental condition at the time of the alleged offenses, even though her mental illnesses, depression, and PTSD contributed to her actions, it is my opinion that at the time of the commission of the acts constituting the alleged offense(s), severe mental disease or defect did not prevent the defendant from appreciating the

14

nature and wrongfulness of such acts pursuant to T.C.A. § 39-11-501.

With regard to diminished capacity, at the time of the alleged offense of Murder – First Degree, the [Petitioner] was able to form the culpable mental state.

This court entered an additional order having her re-examined on the day she was arraigned on her indictment, 8/15/15, with the same result.

[Counsel] testified that he was aware of the [P]etitioner's history with Dr. [Allen], as he had notes of it in his 1,500 page file he had received as the third attorney on the case, and his investigator had also interviewed Dr. [Allen]. In his view, a mental defense could not have been sustained, and he would have asked the court for funds for experts, even though he had been privately retained, if needed, but chose not to, filing a response to the State's motion that "Defendant does not intend to introduce any evidence concerning a medical diagnosis rendered by a physician." One of his reasons was because he didn't want to open up the possibility that the State would then be able to call its own mental expert at trial.

This court finds that Dr. [Allen] would not have been able to testify that the [P]etitioner, a month after her last visit for medication, could not have formed the requisite culpable mental state, premeditation, to commit Murder First Degree. When asked "You weren't there, you didn't see it, so you can't - - you wouldn't know exactly what she would do in any given situation?" he answered "Correct." This court would not have been able to allow him to testify as a witness regarding diminished capacity even if the defense had attempted to call him, unless this court first found that he would be able to testify that the [P]etitioner was incapable of forming premeditation at the time of the homicide. *See State v, Hall*, 958 S,W,2d 679, 688-692 (Tenn. 1997). The State introduced a recording of the [P]etitioner stating that she would kill him, recorded hours before the homicide. Dr. [Allen] testified that she had a history of maybe three panic attacks a week, lasting half an hour each, but he could not predict when they would happen. In addition, the defense would have found it difficult to present a case of valid self-defense while at the same time attempting to show that the [P]etitioner killed the victim in an act of overreaction to the situation.

Reviewing courts should resist the urge to judge counsel's performance using "20-20 hindsight." *Mobley v. State*, 397 S.W.3d 70, 80

(Tenn. 2013) (quoting *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982)); *see also Strickland v. Washington*, 466 U.S. at 689 (instructing reviewing courts to try "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time"). This court finds that the decision not to call Dr. [Allen] was a sound, strategic choice made by a prepared defense attorney, and did not result in any deficient performance by the [P]etitioner's trial attorney.

(citations to the record omitted).

The evidence does not preponderate against the post-conviction court's findings. The Petitioner asserted that Counsel was ineffective for failing to present her psychiatrist as an expert witness. Counsel testified that he believed the Petitioner's case to be the strongest case of self-defense that he had encountered in twenty-two years of practice. Although introduction of testimony about the Petitioner's traumatic history was another viable trial approach, Counsel felt strongly that self-defense was the better strategy given the facts of the case and his evaluation of the Petitioner as a good witness. As we previously noted, Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams*, 599 S.W.2d at 279-80. This court is to give deference to matters of strategy and tactical choices when the choices are "'informed ones based upon adequate preparation.'" *House*, 44 S.W.3d at 515 (quoting *Goad*, 938 S.W.2d at 369). In this case, Counsel's strategy was informed and based upon the evidence in the case.

The Petitioner's brief discusses Battered Woman Syndrome at length. We note, however, that there was no testimony presented at the post-conviction hearing with respect to Battered Woman Syndrome. Claims made in a brief are not evidence and cannot be considered as such by this Court. "The law is clear that statements of fact made in or attached to pleadings [or] briefs . . . are not evidence and may not be considered by an appellate court unless they are properly made part of the record," i.e., approved by the trial court. *Threadgill v. Bd. of Pro'l Resp.*, 299 S.W.3d 792, 812 (Tenn. 2009).

We conclude that the Petitioner has failed to show by clear and convincing evidence that Counsel's decision to pursue self-defense rather than presenting evidence of a mental health diagnosis to explain her reaction was deficient performance. Therefore, the Petitioner is not entitled to relief.

### III. Conclusion

16

After a thorough review of the record and relevant authorities, we conclude that the post-conviction court properly denied post-conviction relief.  Accordingly, we affirm the judgment of the post-conviction court.


_____
ROBERT W. WEDEMEYER, JUDGE