IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

July 8, 2025 Session

**STATE OF TENNESSEE v. JOSHUA WILSON**

**Appeal from the Criminal Court for Shelby County**
**No. I2400017      Carolyn Wade-Blackett, Judge**

_____

**No. W2024-01287-CCA-R3-CD**
_____

Defendant, Joshua Wilson, appeals the Shelby County Criminal Court's decision to deny judicial diversion in his guilty-pleaded conviction of tampering with evidence, a Class C felony. *See* Tenn. Code Ann. § 39-16-503. Following our review, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

MATTHEW J. WILSON, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and JOHN W. CAMPBELL, SR., JJ., joined.

Josie S. Holland, Memphis, Tennessee, for the appellant, Joshua Wilson.

Jonathan Skrmetti, Attorney General and Reporter; G. Kirby May, Assistant Attorney General; Steven J. Mulroy, District Attorney General; and Fredricka Brown, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

Pursuant to a plea agreement, Defendant pleaded guilty to a single count of tampering with evidence as charged via information, with the trial court to determine whether Defendant should be granted judicial diversion, or if diversion was denied, the manner of service of the three-year, Range I sentence. Following a sentencing hearing, the trial court denied diversion and ordered Defendant to serve his sentence on supervised probation.

## Factual and Procedural Background

The factual basis recited by the State at the combined guilty plea and sentencing hearing provided that "on September 11, 2022, Marquisha Washington called 911, advising there was a male shot" at Stratum Apartments in Memphis. When police officers arrived, they entered apartment 425A and observed Matthew Harper lying on the floor unconscious. Mr. Harper was pronounced dead by paramedics on the scene at 11:10 p.m. Security guard Jalon Brooks told officers that he overheard Mr. Harper "and another male arguing about what seemed to be money." At approximately 9:15 p.m., Mr. Brooks observed "a male, black, slim build, armed with an AR-style rifle tucked under his right shirt"; "a male, black wrapped in a blanket"; and two black females leaving the parking garage in a red sedan. According to Mr. Brooks, "they fled the scene in an unknown direction out of the parking garage."

At the preliminary hearing, the recording of which was entered as an exhibit by Defendant,[1] Ms. Washington testified that Defendant and his brother had been staying at her apartment for a couple of days when Mr. Harper came by at approximately 2:00 p.m. on September 11, 2022, and asked Defendant to "do a scam" by having Defendant cash "pay stubs" using Defendant's driver's license. After the "scam" failed, Mr. Harper came into her room, woke her abruptly, and complained that someone had stolen "his weed" and threatened to "flip my whole room." At some point, Mr. Harper reached toward his pants pocket, and Defendant "fired shots." Mr. Harper "fell," and Defendant "got his stuff" and "left." She and her roommate left with Defendant and his brother; Mr. Harper lay on the floor, wounded but still breathing.

They drove to an apartment complex, where they dropped off Defendant. Defendant's brother then drove the two women to a nearby store, where they used the phone to call the police. Defendant's brother left the women at the store. Ms. Washington said that she had seen Mr. Harper with a gun earlier but that Mr. Harper did not brandish a weapon or threaten to shoot anyone while he was in the apartment.

Memphis Police Department Sergeant Jacoba Boyd worked as the lead investigator in the case. He said that no weapons were recovered from the scene although Mr. Harper was wearing an empty holster. After interviewing witnesses and observing surveillance video, he developed Defendant and his brother as suspects, and both men turned themselves

---

[1] Defendant entered the entire recording into evidence but played only the portion of the recording containing the testimony of Mr. Brooks.

in days after the shooting. Sgt. Boyd said that he observed Defendant on the surveillance video carrying a handgun and a rifle as he left the apartment.

Mr. Brooks testified that before the shooting, he heard Mr. Harper shouting and then saw Mr. Harper, who appeared angry, "clutching on a nine-millimeter" handgun.

Tara Winding, Mr. Harper's mother, testified that Mr. Harper's death was "utterly devastating" and said that she was "tormented by the thought of [Mr. Harper] helplessly lying there, shot multiple times in the center mass of his body . . . while the four suspects walk[ed] pas[t] him." Ms. Winding said that Mr. Harper was enrolled at Full Sail University pursuing a bachelor's degree in business entertainment. She described Mr. Harper as helpful and "selfless" and said that "he provided care packages to the homeless." Ms. Winding complained that Defendant had only been charged with evidence tampering when he had fled the scene after shooting Mr. Harper without calling 911 and then hid the firearm.

Mr. Harper's sister, Nicole Winding, testified similarly about the impact of Mr. Harper's death on her and the family.

Defendant, who was twenty-four years old at the time of the hearing, testified that he understood that he was likely to be convicted of tampering with evidence at trial. He also agreed that, in exchange for his pleading guilty, the State had agreed not to charge his brother with any crime related to the incident. Defendant asked the trial court to place him on judicial diversion, noting that he had no prior criminal record, a high school education, and strong family support. Defendant was working for his brother's father performing janitorial work at the time of the sentencing hearing because he had been unable to find other employment.

Defendant testified that on September 11, 2022, he was staying with Ms. Washington while he waited to move into an apartment with his brother. He said that Ms. Washington and Ms. Williams bought drugs from Mr. Harper. At some point, Mr. Harper asked Defendant and his brother to take a check to the store and cash it, and he promised to "give [Defendant] something out of it." Defendant said that Mr. Harper "said it was, like, a work check," and they would "just put my name on it, and we can get some money out of it." The cashier refused to take the check, so Defendant returned the check to Mr. Harper and walked back to the apartment.

3

Defendant claimed that Mr. Harper returned to the apartment later and accused him of stealing "27 grams" of his "stuff" and that when he denied it, Mr. Harper "dipped out." Defendant said that Mr. Harper returned shortly thereafter and said, "I finna to flip this b****." Defendant claimed that he saw Mr. Harper "slowly going for his gun," so he shot Mr. Harper with his own semi-automatic weapon. Defendant said he believed that his life was in danger.

Defendant described the night of the shooting as "the worst night of my life." Defendant said that after he shot Mr. Harper, he did not hear him breathing. Defendant, his brother, and the two women ran from the apartment. He and his brother dropped the women off at a nearby store to call the police. Defendant went to his mother's house. His mother called a police officer that she knew, and Defendant told the officer that he was "just going to say my good byes" before turning himself in. Defendant said that he "put[] in time with" his girlfriend and that he planned to turn himself in "later on that night." Instead, he was arrested at a gas station while "getting some snacks."

Defendant remained in custody until he was released on a $50,000 bond following the preliminary hearing. While incarcerated, Defendant "got to fighting" in the jail. Defendant said that he had had difficulty finding work while on bond but that he had been making money cleaning schools with his brother's godfather. He said that he had humbled himself by taking the janitorial job. He testified that he had no criminal record but that he had used marijuana with regularity, even while on bond in this case. He promised, however, to refrain from any further marijuana use should he be placed on judicial diversion or probation. Defendant said that he did not "have time to go back to jail" because he said he "went through a hard time in there, and I don't want to go through that again."

Defendant said that he regretted shooting Mr. Harper "because I miss my old life." He also apologized to Mr. Harper's family, saying, "[I]f I could take that back, I'd be happy to 'cause I didn't have to go through none of that." Defendant testified that he "had a good life" before the shooting and that since the shooting, he had "been through hell." He added, "I'm so sick of this, I'm ready to get this over with."

During cross-examination, Defendant testified that he smoked an average of "three blunts a day" to deal with his bipolar disorder but that he would be willing to stop using marijuana if he were able to avoid jail. He also agreed to resume medication for his bipolar disorder and to attend counseling. Defendant testified that he accepted responsibility for ending Mr. Harper's life.

4

Defendant's mother, Iveshon Miller, testified that she would be willing to help him successfully complete the requirements of probation or diversion. She said that Defendant was not a violent person and that he should be granted probation or diversion "because he was defending for his life." She called Defendant "a hero in my eyesight due to the situation." She expressed sympathy for Mr. Harper's family. Ms. Miller described Defendant as "very remorseful" for taking Mr. Harper's life.

At the conclusion of the hearing, Defendant again asked the trial court to place him on diversion. The State agreed that "according to the factors," Defendant was "a great candidate for probation or diversion" but stopped short of recommending either.

The trial court observed that neither Defendant nor Mr. Harper "were angels" and that "nobody's ever going to know whether or not" Defendant's version of events was "really true" because the court only heard Defendant's "side of the story." The court acknowledged that Defendant was eligible for judicial diversion and that Mr. Harper's death did not preclude the grant of diversion. The court found that Defendant was young, was a parent, had no criminal record, had the support of his family, and had been looking for work. However, the court expressed great hesitation about placing Defendant on diversion given that shootings were "a major problem in this community." The court also assigned great weight to the fact that Defendant had "the gun in the first place" while he was "in the wrong place at the wrong time doing the wrong things."

Ultimately, the trial court denied diversion and said, "I need this to be a deterrence for this community" to know that "even if it's self-defense, it's the needless shootings; taking of life; being in the wrong place at the wrong time; participating in illegal behavior; whatever it is, is wrong." The court told Defendant that he did not "just get to walk away with it" or "get the chance to just, like, never look back and never say on your record that you ever had a problem or an issue." The trial court said that "there is a price to pay" for Defendant's conduct. The court reiterated that Defendant met the requirements for diversion but explicitly denied declining to grant diversion "just because somebody died."

The trial court imposed a sentence of three years to be served on full probation, observing that "probation would be better for" Defendant and that the sentence "would be a deterrent for the entire community to know you just can't go around shooting people, even in self-defense."[2] The court said that its decision to deny diversion was "very hard"

---

[2] To the extent that the trial court's comment can be interpreted to say that the use of deadly force in self-defense is not permissible in Tennessee, it is an incorrect statement of the law, *see generally* Tenn. Code Ann. § 39-11-611, and, in any event, it has no bearing on our decision in this case.

but that "in this particular situation, probation is the best thing." The court added, "I don't want you to go back to jail. I just don't feel that this amounts to judicial diversion."

Immediately after the trial court announced its decision to deny diversion, Defendant argued that the trial court had failed to take into consideration that Mr. Harper "likely would have died from methamphetamine exposure had he not been shot" given the amount of methamphetamine in his system at the time of autopsy.[3] Defendant also argued that the sentence should focus on the "tampering with evidence charge," noting that it was a "non-violent" felony, and that the court should "not even consider[] the fact" that he was originally charged with second degree murder. Defendant also argued that the trial court had not "weighed any of the factors on the record." Defendant accused the trial court of denying diversion based upon "tears that were cried on the witness stand today and not for a legal reason and not for a . . . statutory reason."

In response, the trial court explained that it had considered "the factors on the record as to judicial diversion" and acknowledged that Defendant did not stand charged with second degree murder. The court stated that its "decision was not based on tears, it was not based on a statement, it was based on the fact that there was a life taken, and all we have is what has been said by other parties." Regarding Mr. Harper's methamphetamine consumption, the court said, "[A]s far as I'm concerned, it's presumption" and emphasized that it had based its decision on "what I have as facts." The court reiterated that probation was appropriate because it would give Defendant "a way to come back here," referencing the court's earlier statement that it would be open to a request to reconsider probation should Defendant's probation compliance prove to be "exemplary."[4] The court concluded, however, that it could not ignore "the fact that there has been another life lost in this whole situation." Finally, the court repeated that its decision was "not an easy decision by any means" but that it had made its ruling.

Following the denial of judicial diversion, Defendant filed a timely notice of appeal to this court.

---

[3] The autopsy report was not entered into evidence at the hearing and was not otherwise made a part of the record on appeal. "[T]he statements made by counsel during the course of a hearing, trial, or argument" are not evidence. *See State v. Roberts*, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988).
.

[4] Based on the context, this appears to be a reference to Code section 40-35-308, which permits the sentencing court to modify or remove any condition of probation or "[r]elease the defendant from further supervision; provided, that release from supervision shall not discharge the defendant from the remainder of the sentence, and the defendant shall remain within the jurisdiction and authority of the sentencing court until the sentence fully expires." Tenn. Code Ann. § 40-35-308(a).

**Analysis**

On appeal, Defendant challenges the denial of judicial diversion, arguing that the trial court's decision is not entitled to a presumption of reasonableness and that the court erred by denying diversion. The Defendant also asserts that the State had waived the right to object to the imposition of diversion. The State contends that it did not acquiesce to the grant of diversion below and that the trial court did not abuse its discretion by denying diversion.

## I. The Record on Appeal

Defendant's brief contains several factual assertions and references to the procedural history that do not appear in the record on appeal and that are not supported by any citation to the record. "The appellate record provides the boundaries of an appellate court's review," and, in consequence, this court "may consider only evidence contained in the appellate record." *State v. Smotherman*, 201 S.W.3d 657, 660 (Tenn. 2006) (citing *State v. Bobadilla,* 181 S.W.3d 641, 643 (Tenn. 2005)); Tenn. R. App. P. 13(c), 24(g). We cannot and will not consider facts outside the record. *See Threadgill v. Bd. of Prof'l Responsibility of Supreme Court*, 299 S.W.3d 792, 812 (Tenn. 2009), *overruled on other grounds by Lockett v. Bd. of Prof'l Responsibility*, 380 S.W.3d 19 (Tenn. 2012) ("Tennessee Rule of Appellate Procedure 13(c) permits appellate courts to consider only those facts established by the evidence in the trial court record and any additional facts that may be judicially noticed or are considered pursuant to Tennessee Rule of Appellate Procedure 14."). Furthermore, it is well-settled "that statements of fact made in or attached to pleadings, briefs, and oral arguments are not evidence and may not be considered by an appellate court unless they are properly made part of the record." *Id.* (first citing *State v. Bennett,* 798 S.W.2d 783, 789 (Tenn. Crim. App. 1990); and then *State v. Taylor,* 992 S.W.2d 941, 944 (Tenn. 1999)).

Defendant's brief refers extensively to a stipulation entered by the parties concerning a conversation the parties had "at the bench" in a wholly different proceeding "in anticipation of" the upcoming sentencing hearing in Defendant's case. No transcript of this conversation was included in the record on appeal, and the stipulation itself was not filed until November 7, 2024, two months after Defendant's sentencing hearing, six weeks after the filing of the notice of appeal, and fourteen days *after* this court granted Defendant a fifteen-day extension for preparation of the record. Defendant did not ask this court to consider any post-judgment facts pursuant to Tennessee Rule of Appellate Procedure 14, and the stipulation does not contain any post-judgment facts. *See* Tenn. R. App. P. 14 (stating that an appellate court may, on its own motion or motion of a party, "consider facts concerning the action *that occurred after the judgment*") (emphasis added). Most

7

importantly, the transcript does not reflect that the trial court considered any of the facts contained in the stipulation. If Defendant wanted the trial court to consider the information contained in the stipulation, or in the autopsy for that matter, he was under a duty to present it on the record at the sentencing hearing. Because that did not happen, we will not consider it in this appeal.

## II. State's Waiver

Citing Tennessee Rule of Appellate Procedure 36, Defendant contends that the State has forfeited its right to object to the grant of judicial diversion on appeal because it did not oppose diversion below. Defendant misrepresents the position of the State in the trial court and misconstrues the role of the State in this appeal. To be fair, the State, through the District Attorney General's office, did not specifically advocate for diversion or probation, saying Defendant would have been a "great candidate" for either. The State could have been clearer on its position in the trial court. Yet, although the State did not indicate opposition to the grant of diversion, it stopped short of endorsing the grant of diversion. Similarly, the State does not oppose a grant of diversion on appeal and instead takes the position that the trial court did not err by denying diversion. Accordingly, we conclude the State has not taken a position contrary to the one it took below and has not raised a new or different issue for the first time on appeal.

## III. Judicial Diversion

Following a determination of guilt by plea of guilty or nolo contendere or by trial, a trial court may, in its discretion, defer further proceedings and place a qualified defendant on probation without entering a judgment of guilt, a practice commonly referred to as "judicial diversion." *See* Tenn. Code Ann. § 40-35-313(a)(1)(A); *State v. Dycus*, 456 S.W.3d 918, 925 (Tenn. 2015). Upon the "successful completion of the probationary period under judicial diversion, 'the court shall discharge the person and dismiss the proceedings against the person.'" *Dycus*, 456 S.W.3d at 925 (quoting Tenn. Code Ann. § 40-35-313(a)(2)). Following such dismissal, the defendant may seek expunction of the defendant's criminal record. *Id.* (first citing Tenn. Code Ann. § 40-35-313(a)(1)(A); and then *State v. King*, 432 S.W.3d 316, 323 (Tenn. 2014)). As such, "judicial diversion is not a sentence; rather, the grant or denial of judicial diversion is simply a decision to defer a sentence or to impose one." *State v. Sheets*, No. M2022-00538-CCA-R3-CD, 2023 WL 2908652, at *6 (Tenn. Crim. App. Apr. 12, 2023) (citing *King*, 432 S.W. 3d at 324-25). "Our supreme court has described judicial diversion as a 'legislative largess' available to a qualified defendant." *Id*. (citing *State v. Schindler*, 986 S.W.2d 209, 211 (Tenn. 1999)).

To qualify for diversion, a defendant must be found guilty of, or plead guilty or nolo contendere to, an offense that is not "a sexual offense or a Class A or Class B felony" and not have a prior conviction for a felony or Class A misdemeanor. Tenn. Code Ann. § 40-35-313(a)(1)(B)(i)(b), (c). As the trial court acknowledged, Defendant was qualified for judicial diversion. Yet being eligible for judicial diversion does not equal entitlement to diversion as a matter of law. *See State v. Bonestel*, 871 S.W.2d 163, 168 (Tenn. Crim. App. 1993), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1, 9 (Tenn. 2000)).

When determining whether to grant diversion, the trial court must consider: (1) the accused's amenability to correction, (2) the circumstances of the offense, (3) the accused's criminal record, (4) the accused's social history, (5) the accused's physical and mental health, (6) the deterrence value to the accused as well as others, and (7) whether judicial diversion will serve the interests of the public as well as the accused. *State v. Electroplating*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998) (citing first *State v. Parker*, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996); and then *Bonestel*, 871 S.W.2d at 168). The trial court "must weigh the factors against each other and place an explanation of its ruling on the record." *King*, 432 S.W.3d at 326 (citing *Electroplating*, 990 S.W.2d at 326). The trial court need not specifically recite all the *Parker* and *Electroplating* factors to be granted the presumption of reasonableness, but "the record should reflect that the trial court considered the *Parker* and *Electroplating* factors in rendering its decision and that it identified the specific factors applicable to the case before it. Thereafter, the trial court may proceed to solely address the relevant factors." *Id.*

If the trial court follows these mandates, "the appellate court must apply a presumption of reasonableness and uphold the grant or denial so long as there is any substantial evidence to support the trial court's decision." *King*, 432 S.W.3d at 327 (footnote omitted). "If, however, the trial court fails to consider and weigh the applicable common law factors[,] . . . the appellate courts may either conduct a de novo review or, if more appropriate under the circumstances, remand the issue for reconsideration." *Id.* at 327-28. Such a decision "is within the discretion of the reviewing court." *Id.* at 328.

*A. Standard of Review*

Although the trial court could have been more articulate when conveying its weighing of the *Parker* and *Electroplating* factors, the record demonstrates that the trial court did consider and weigh the appropriate factors in favor and against granting diversion before making its decision. It acknowledged that Defendant was young, that he had no criminal record, that he had good family support, and that he had been looking for work, and found these weighed in favor of granting diversion. These findings establish that the trial court considered Defendant's criminal record, social history, and his physical and

9

mental health. *See Electroplating*, 990 S.W.2d at 229 (citations omitted). The trial court also determined that Defendant was amenable to correction as reflected by the imposition of a sentence of full probation. *See id.*

Ultimately, however, the trial court determined that the circumstances of the offense, including Defendant's gun possession and the death of Mr. Harper, and the need to deter shootings in the community warranted the denial of diversion. *See id.* The court also found that the grant of diversion would not serve the needs of Defendant or of the community. *See id.* Contrary to Defendant's assertion, the trial court did not deny diversion based upon the loss of life alone or on the need for deterrence alone. Because the trial court considered and weighed the appropriate factors, we will apply a presumption of reasonableness to the trial court's sentencing decision. *King*, 432 S.W.3d at 327.

## B. Review for Abuse of Discretion

Following our review, we conclude that nothing overcomes the presumption of reasonableness afforded the trial court's decision and that substantial evidence supports the denial of judicial diversion in this case. As the trial court acknowledged, Defendant's age, lack of criminal record, family support, and efforts to maintain employment weighed in favor of granting judicial diversion. *See Parker*, 932 S.W.2d at 958.

Although the trial court did not use the term "circumstances of the offense," the record clearly demonstrates that the court was concerned with the circumstances of the offense when it chose to deny diversion. After shooting Mr. Harper, Defendant fled the scene with the weapon he used and left Mr. Harper for dead. He did not attempt to render aid or to call 911. Instead, he went to his mother's house and had her negotiate his surrender with a friend in the police department. But he did not surrender immediately and, instead, elected to spend time with his girlfriend and purchase "snacks" before doing so. At some point he hid the weapon used to shoot Mr. Harper. These actions "significantly exceeded" those required to satisfy the elements of the offense of tampering with evidence. *Cf. State v. Lacy*, No. W2016-00837-CCA-R3-CD, 2017 WL 1969764, at *6 (Tenn. Crim. App. May 12, 2017) (holding that denial of diversion based upon the circumstances of the offense was inappropriate when no evidence suggested "that the defendant's actions significantly exceeded those required to satisfy the elements of the offense"). Additionally, none of these additional circumstances were encompassed within the elements of the offense of conviction. *Cf. State v. Gobble*, No. E2014-01596-CCA-R3-CD, 2015 WL 12978645, at *10 (Tenn. Crim. App. Aug. 12, 2015) (holding that trial court erred by focusing on the loss of life and the defendant's leaving the scene of a motor vehicle accident she caused when those "facts are already incorporated into the elements of the offense" for which she was

10

convicted). Consequently, the record supports the trial court's conclusion that the circumstances of the offense weighed against the grant of judicial diversion.

The trial court also found that the grant of diversion was not appropriate given the number of shootings within the community. This was an appropriate consideration of general deterrence, and the court concluded that Defendant's conviction would act as a deterrent to others and serve the interests of the public. Relatedly, the court determined that a grant of diversion would not serve as a specific deterrent to Defendant, observing that Defendant should not be permitted to "just get to walk away with it" and "never look back and never say on your record that you ever had a problem or an issue." We have concluded that granting diversion may favor the interests of the defendant when necessary to avoid the stigma of a felony conviction and its implications on future employment. *See Sheets*, 2023 WL 2908652, at *12 (Tenn. Crim. App. Apr. 12, 2023) (collecting cases). However, the grant of diversion does not serve the interests of the public or the defendant when it depreciates the seriousness of the offense or where the collateral consequences of a conviction would protect the public. *See id.* (collecting cases). The record supports the trial court's findings that the denial of diversion best served the interests of the public and Defendant and that a felony conviction would serve as a deterrent to others in the community.

By imposing a sentence of full probation, the trial court recognized that, in this case, "the need for incapacitation was not evident from a long history of criminal conduct and that rehabilitation was reasonably feasible." *State v. Willoughby*, No. E2023-01499-CCA-R3-CD, 2025 WL 1202079, at *10 (Tenn. Crim. App. Apr. 25, 2025). The court's decision also reflects "that the fact of a felony conviction accounted for both deterrence and the need to avoid depreciating the seriousness of the offense." *Id.*

## Conclusion

In sum, the trial court properly considered the *Parker* and *Electroplating* factors in its decision to deny diversion. Its decision is presumed reasonable, substantial evidence supports its decision, and we will not second-guess its determination. Accordingly, we affirm the judgment of the trial court.

s/ Matthew J. Wilson
_____
MATTHEW J. WILSON, JUDGE

11